SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Salvatore Puglia v. Elk Pipeline, Inc., et al. (A-38-14) (075171)**

**Argued January 6, 2016 -- Decided August 16, 2016**

**LaVECCHIA, J., writing for a unanimous Court.**

In this appeal, the Court addresses whether a state-law whistleblower retaliation claim premised on an employee's complaints about wage and hour requirements is preempted by federal law.

Plaintiff Salvatore Puglia was a laborer for defendant Elk Pipeline, Inc. The Court reviews the facts of this case in the light most favorable to Puglia on this summary judgment record. A collective bargaining agreement (CBA) governed the terms of Puglia's employment. In 2010, Puglia worked on a public works job for the City of Camden, which was subject to the provisions of New Jersey's Prevailing Wage Act, N.J.S.A. 34:11-56.25 to -56.47. In January 2010, his wage rate was cut in half. When he and a co-worker asked their supervisor about the decrease, they were told that they had been placed in a fake apprenticeship program. Puglia discussed the cuts with other laborers and complained to the project manager, Mike Tedesco, and Elk's president, Thomas Mecouch. He then spoke with the resident engineer, who determined that several employees were not being paid required wages. Soon thereafter, Elk resolved the payroll-rate problem, restored the prevailing wage rate, and paid the affected employees back pay. Puglia protested, believing that he was not paid the full amount of owed back pay. Puglia was laid off in December 2010. Elk maintains that he was laid off because the Camden project was winding down and the remaining work only required two of the three onsite laborers.

Puglia filed a four-count complaint, alleging violations of the Prevailing Wage Act and New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. The parties settled the Prevailing Wage Act claim and stipulated to its dismissal. The remaining CEPA claim alleged that, by complaining about Elk's failure to pay him the proper wages, Puglia engaged in a whistleblowing activity, for which he was later terminated. In Puglia's complaint and deposition, he also noted that he was more senior than the two non-laid-off laborers. Elk moved for summary judgment, arguing that Puglia's CEPA claim was preempted by federal labor law.

The first proposed avenue of preemption was via Section 301(a) of the Labor Management Relations Act (LMRA), which grants jurisdiction to the federal courts to hear disputes arising out of labor agreements. Under Section 301 preemption, there can be a state-court action, but the state court must apply federal law. It applies to claims directly alleging CBA breaches, as well as to claims that, although couched in terms of state tort law, relate to the CBA and the intended legal consequences of any breaches. It has been described as choice-of-law preemption.

The second proposed avenue of preemption, National Labor Relations Act (NLRA) preemption, has a different focus. Section 7 of the NLRA protects employees' rights to organize, join labor unions, and collectively bargain. Section 8 prohibits employers from interfering with, restraining, or coercing employees in the exercise of these rights. The National Labor Relations Board (NLRB) has exclusive jurisdiction to determine what activity is protected by Section 7 or prohibited by Section 8. State jurisdiction over these issues must yield to the NLRB when it is clear or may be fairly assumed that the activities are protected or prohibited. Preemption in this context is choice-of-forum preemption.

After determining that Puglia's claims were founded on rights created in the CBA, the trial court held that Section 301 preempted his CEPA claim. The trial court also concluded that Puglia's CEPA claim was preempted by the NLRA because it involved conduct arguably subject to Section 7 or Section 8. Puglia appealed, and the Appellate Division affirmed. Puglia v. Elk Pipeline, Inc., 437 N.J. Super. 466 (App. Div. 2014). The panel noted that Puglia's allegation that he was more senior than non-laid-off laborers could be reviewed only by interpretation of the CBA and its terms. Consequently, the panel concluded that Puglia's CEPA claim was preempted by federal law. The Court granted Puglia's petition for certification. 220 N.J. 573 (2015).

**HELD:** Under the circumstances here, Puglia's CEPA claim, which neither requires interpretation of the CBA nor presents a question that would be within the jurisdiction of the NLRB, is not preempted by the LMRA or the NLRA.

1. The Court recognizes that minimum labor standards established by state law, which affect union and nonunion employees equally and have, at most, an indirect effect on the right of self-organization, are not preempted by the

NLRA. Thus, the Prevailing Wage Act's guarantee that certain wages be paid to workers on public works projects is not preempted by federal law. The more refined question here is whether complaints about violations of that minimum labor standard, and the concomitant State interest in curbing retaliation for such complaints, invokes preemption concerns. (pp. 15-18)

2. The United States Supreme Court's decision in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399 (1988), set out the principle that guides a Section 301 preemption analysis under the LMRA: Where resolution of a state-law claim depends on the meaning of a CBA, the application of state law, which could be inconsistent across States, is preempted, and uniform federal labor-law principles must be employed. Under this principle, a retaliatory discharge claim can survive a Section 301 preemption analysis, but it is less clear whether a defendant's claim that the CBA justified its negative employment action can preempt an otherwise independent, state-law action. Further Supreme Court decisions have fortified the view that CBA-based defenses ordinarily are insufficient to preempt an independent state-law action. (pp. 18-25)

3. Based on Puglia's complaint, his CEPA cause of action is unaffected by whether the CBA was violated since it asks only whether his whistleblowing activity played a role in his termination. Puglia's references in his complaint and deposition to his seniority neither alter the substance of his CEPA claim nor inject a question of CBA interpretation. Nevertheless, the Court holds Puglia to his representation that he will jettison any reliance on his complaint's mention of his seniority rights in his case-in-chief. Finally, even if Elk could establish that the CBA justified the firing, Puglia may still prevail on his CEPA claim because it turns on questions that remain factually based. In deciding whether an employer acted with a retaliatory motive in a specific CEPA claim, it is not necessary to determine whether the employer correctly based its actions on the CBA, and an employer cannot secure preemption of a CEPA claim simply by asserting as a defense that it acted in accord with a provision of the CBA. Here, Puglia's CEPA claim is not preempted by Section 301 of the LMRA. (pp. 25-32)

4. The modern contours of NLRA preemption were set forth in San Diego Building Trades Council v. Garmon, 359 U.S. 236 (1959), in which the Supreme Court announced a broad rule: When state law attempts to regulate conduct that is arguably protected or arguably prohibited under the NLRA, state jurisdiction must yield. The Supreme Court has since refined this rule, focusing on the nature of the interests being asserted and the effect a state court proceeding would have on the administration of national labor policies. Under this refined rule, the arguably protected or arguably prohibited nature of the conduct, by itself, is not enough to preempt state jurisdiction. Rather, the underlying rationales that support preemption must be present, and those rationales differ based on whether state law is attempting to regulate conduct that is arguably protected under Section 7 or arguably prohibited under Section 8. However, even if the rationales supporting preemption are present, Garmon provides exceptions to preemption when the regulated activity is only a peripheral concern of the NLRA or when the conduct touches interests deeply rooted in local feeling and responsibility. (pp. 32-44)

5. If it is a close question whether it is arguable that conduct constituted protected activity under Section 7 or prohibited activity under Section 8, NLRA preemption would apply. By complaining about his wages to another worker, or by bringing a group complaint to management, Puglia arguably engaged in protected concerted activity. Similarly, by allegedly firing Puglia in response, Elk arguably engaged in conduct prohibited by Section 8. However, under the refined Garmon analysis, which focuses on whether state-court jurisdiction would interfere with the NLRB's primary jurisdiction, the relevant question is whether Puglia's CEPA claim is identical to the claim that he could have, but did not, present to the NLRB. Puglia's CEPA claim would center on whether he engaged in whistleblowing activity and whether that activity played a role in his termination. An NLRA claim would instead focus on whether Puglia engaged in concerted activity aimed at the conditions of his employment. Because the two claims are not identical, the Court concludes that the risk of infringing on the NLRB's primary jurisdiction in this case does not demand preemption. This conclusion is buttressed by CEPA's general applicability and New Jersey's interest in enforcing it. Any interference with the federal scheme by allowing this CEPA claim to go forward in state court would be de minimis. Moreover, to find that statutes like the Prevailing Wage Act are not preempted, but that allegations of retaliatory discharge in response to complaints under those statutes are, would undermine the purpose of those statutes and leave employees with a half-baked remedy. Consequently, in this matter, the NLRA does not preempt Puglia's CEPA claim. (pp. 44-49)

The judgment of the Appellate Division is **REVERSED**.

**CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE FERNANDEZ-VINA did not participate.**

SALVATORE PUGLIA,

    Plaintiff-Appellant,

       v.

ELK PIPELINE, INC., ELK
PIPELINE, INC. t/a and/or
d/b/a CROWN PIPELINE
CONSTRUCTION COMPANY, CROWN
PIPELINE CONSTRUCTION
COMPANY, THOMAS MECOUCH,
individually and as the
corporate alter ego,

    Defendants-Respondents.

Argued January 6, 2016 – Decided August 16, 2016

On certification to the Superior Court, Appellate Division, whose opinion is reported at 437 N.J. Super. 466 (App. Div. 2014).

Deborah L. Mains argued the cause for appellant (Costello & Mains, attorneys).

Douglas Diaz argued the cause for respondents (Archer & Greiner, attorneys; Mr. Diaz and Tracy Asper Wolak, on the brief).

Ravi Sattiraju argued the cause for amicus curiae New Jersey Association of Justice.

John J. Sarno argued the cause for amicus curiae Employers Association of New Jersey (FordHarrison, attorneys; Mr. Sarno and Mark A. Saloman, of counsel and on the brief).

JUSTICE LaVECCHIA delivered the opinion of the Court.

1

New Jersey has a significant body of statutory and decisional law protecting employee rights -- protections that exist whether the employee is a union member or not.  Among those are wage and hour and whistleblower protections.  Facts that can give rise to a violation of those state-law protections can often (for union workers) also give rise to a claim based on a collective bargaining agreement (CBA) or under the National Labor Relations Act (NLRA).  This appeal raises questions involving federal labor-law preemption and asks whether a state-law whistleblower retaliation claim premised on an employee's complaints about wage and hour requirements is preempted based on that factual overlap.

Specifically, plaintiff Salvatore Puglia filed an action against his employer under New Jersey's Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, claiming that his employment was terminated after he complained about his employer's failure to pay him in accord with the Prevailing Wage Act, N.J.S.A. 34:11-56.25 to -56.47.  The trial court held that the NLRA and the Labor Management Relations Act (LMRA) both preempted Puglia's claims.  The Appellate Division affirmed that judgment.  We now reverse.

I.

A.

2

Puglia was a laborer for defendant Elk Pipeline, Inc. -- an underground utility contractor and construction company -- from 2006 through 2010.[1]  During his employment with Elk, Puglia was a union member, and a CBA governed the terms of his employment.

Puglia was working on a sewer reconstruction project for the City of Camden during the last year of his employment with Elk.  Because the Camden project was a public works job, it was subject to the provisions of New Jersey's Prevailing Wage Act.  Unexpectedly for Puglia, in January 2010, Puglia's wage rate was cut in half, and the new, lower wage reflected Puglia's supposed placement in an apprenticeship program.

Other laborers also saw their wage rate reduced.  When Puglia first discovered the drop in pay, he was with another laborer, Robert Barrette.  The two men immediately brought up the issue with their supervisor, Eric Larsen, asking why their wages had been halved.  According to Puglia, Larsen told them that they had been placed in a fake apprenticeship program and that they should talk to the project manager, Mike Tedesco, about it.  After Puglia approached him, Tedesco repeated the apprenticeship explanation.  According to Puglia, however,

---

[1] The facts as recited herein are based on the summary-judgment record.  As did the trial court, in our appellate review we view the facts in the light most favorable to the party resisting the motion for summary judgment, here Puglia.  Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

3

Tedesco admitted that an apprenticeship program did not exist and that Elk never received approval for such a program.

Puglia and other laborers on the job site talked about the wage cut, "trying to get to the bottom of everything." Puglia continued to complain about his reduced wages, first almost daily to Larsen and eventually to Elk's president, Thomas Mecouch. Mecouch adhered to the apprenticeship explanation, adding that "[the laborers] were in an apprenticeship program" and that he could pay only "[ninety] percent of the apprenticeship rate." Puglia nonetheless continued to talk with Tedesco about the issue, and Tedesco referred him to Jim Takacs, the resident engineer on the project.

As the resident engineer on the project, Takacs's duties included enforcing the Davis-Bacon Act, 40 U.S.C.A. §§ 3141-3148. Puglia spoke with Takacs in August, after which Takacs reviewed Elk's payroll records and determined that several employees were not being paid the required wages. Takacs told Tedesco that Elk needed to resolve the issue and bring the laborers' wages up to the prevailing rate. When Takacs raised the subject of Puglia's pay specifically, Tedesco told him that Puglia was in an apprenticeship program. Takacs responded that there was no approved apprenticeship program in place at the Camden job. Tedesco allegedly replied, purportedly off the

record, that "the owner wanted to [f**k] with [Puglia] and wants to get rid of him."

Tedesco then went to Mecouch and advised him that Elk could pay an apprenticeship rate only if it had a State-approved program. Elk soon resolved the payroll-rate problem, restoring the prevailing wage rate for the laborers and paying the affected employees back pay in September. But Puglia still protested, believing that he was not paid the full amount of back pay due to him. Puglia again approached Tedesco, who, according to Puglia, told him that Mecouch said that he had to "either be quiet and keep [his] job or be laid off."

Puglia was laid off in December 2010. Puglia asserts that Darren Capano, the new site supervisor, approached him, told him that he was laid off, handed him a paycheck, and said to go "look for a new job." That was done, Puglia said, without further explanation.

Elk offers a different version of the termination of Puglia's employment. As 2010 was ending, the Camden project was winding down. At that time, the project employed three laborers, and the remaining work required only two. Although the other two laborers had less seniority than Puglia, they had completed a training program and attained certifications -- benchmarks that Puglia had not met. Those two other laborers were, according to Capano, "the two best laborers to do the work

5

that needed to be done."  Moreover, Mecouch asserts that Puglia was not laid off but was instead told to report to another Elk job site, which he did not do.

B.

Puglia filed a four-count complaint in the Superior Court against Elk and Mecouch personally, alleging violations of the Prevailing Wage Act and CEPA and requesting equitable relief. The parties settled the Prevailing Wage Act claim and stipulated to its dismissal.  Puglia's remaining CEPA claim alleged that, by complaining about Elk's failure to pay him the proper wages under the Prevailing Wage Act, Puglia engaged in a whistleblowing activity, for which he was later terminated.  Elk filed a motion for summary judgment on the CEPA claim, arguing that Puglia's CEPA claim was preempted by federal labor law on multiple bases.  Before turning to the trial court's decision in the first instance and the Appellate Division's opinion on appeal, we provide some basic background on the two strands of federal preemption at issue.

1.

Section 301(a) of the LMRA is a grant of jurisdiction to the federal courts to hear disputes arising out of labor agreements.  It states:

> Suits for violation of contracts between an
> employer and a labor organization representing
> employees in an industry affecting commerce as

> defined in this Act, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
>
> [29 U.S.C.A. § 185(a).]

Besides creating federal jurisdiction for those suits, Section 301 has been given broad substantive effect. The Supreme Court has directed the federal courts to create a federal common law governing the interpretation of labor contracts. See Textile Workers Union of Am. v. Lincoln Mills of Ala., 353 U.S. 448, 456, 77 S. Ct. 912, 918, 1 L. Ed. 2d 972, 980 (1957). Further, that federal common law prevails over any inconsistent state law, barring "[t]he possibility that individual contract terms might have different meanings under state and federal law" and might thereby "exert a disruptive influence upon both the negotiation and administration of collective agreements." Local 174, Teamsters v. Lucas Flour Co., 369 U.S. 95, 103, 82 S. Ct. 571, 577, 7 L. Ed. 2d 593, 599 (1962).

Under Section 301 preemption, there can be a state-court action, see Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 508, 82 S. Ct. 519, 523, 7 L. Ed. 2d 483, 488 (1962), but the state court must apply federal law, see Lucas Flour, supra, 369 U.S. at 104, 82 S. Ct. at 577, 7 L. Ed. 2d at 600. Section 301

7

applies not only to those claims that directly allege a breach of a CBA but also to claims that, although couched in terms of state tort law, "relat[e] to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement." Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 211, 105 S. Ct. 1904, 1911, 85 L. Ed. 2d 206, 215 (1985). Thus, Section 301 preemption has been described as choice-of-law preemption.

NLRA preemption has a different focus. Section 7 of the NLRA protects employees' right to organize, to join labor unions, to collectively bargain, and to "engage in other concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C.A. § 157. Section 8 makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7." 29 U.S.C.A. § 158(a)(1). Congress left for the National Labor Relations Board (Board or NLRB), in its exclusive jurisdiction, to determine what activity is protected by Section 7 or prohibited by Section 8. See Bldg. Trades Emp'rs' Educ. Ass'n v. McGowan, 311 F.3d 501, 508 (2d Cir. 2002).

In San Diego Building Trades Council v. Garmon, 359 U.S. 236, 244, 79 S. Ct. 773, 779, 3 L. Ed. 2d 775, 782 (1959), the Supreme Court set out the following rule for NLRA preemption: "When it is clear or may fairly be assumed that the activities

8

which a State purports to regulate are protected by [Section] 7 of the National Labor Relations Act, or constitute an unfair labor practice under [Section] 8, due regard for the federal enactment requires that state jurisdiction must yield." Preemption in this context is thus choice-of-forum preemption. If there is preemption, then there is no state-court (or even federal-court) jurisdiction. See Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 391, 106 S. Ct. 1904, 1912, 90 L. Ed. 2d 389, 401 (1986).

2.

In ruling on Elk's motion for summary judgment, the trial court addressed the two preemption theories serially.

First, the trial court addressed Section 301 preemption. The court explained that state-law claims are "preempted [under Section 301 of the LMRA] if the application of state law requires the interpretation of a CBA." The trial court focused on paragraph 29 of Puglia's complaint, which stated that he was laid off despite having more seniority than other employees who were not terminated. Based on that statement, the trial court determined that Puglia's claims were founded on rights created in the CBA. Because Puglia invoked that CBA-grounded right not only in his complaint but also in his deposition, the trial court held that Section 301 preempted his CEPA claim.

9

Second, the trial court addressed NLRA preemption and concluded that Puglia's CEPA claim was preempted, based on the United States Supreme Court's decision in Garmon. As explained by the trial court, Garmon holds that state-law claims that involve conduct arguably subject to Section 7 or Section 8 of the Act are preempted. The trial court concluded that Puglia's claim was the type intended to be preempted under Garmon's interpretation of the Act.

Puglia appealed, and the Appellate Division affirmed in a reported decision. Puglia v. Elk Pipeline, Inc., 437 N.J. Super. 466 (App. Div. 2014). The panel stated that when analysis of a state-law claim requires interpretation of the CBA, federal labor law preempts that claim. Id. at 476. The panel examined Puglia's complaint, noting the allegation of retaliatory discharge and specifically highlighting Puglia's allegation in the complaint that his status as the more-senior employee should have allowed him to continue working instead of the non-laid-off laborers. Id. at 477. Turning then to the terms of the CBA applicable here, the panel determined that the seniority provision "weigh[ed] not just objective factors, such as length of service, but also . . . consider[ed] subjective factors to determine who retains employment based upon seniority." Id. at 478. In the panel's view, Puglia's seniority status could be reviewed only by analysis of the CBA-

10

identified factors and could not be "rebrand[ed]" as a CEPA claim.  Ibid.  According to the panel, Puglia's claim would necessarily embrace more than his allegation that he was laid off in response to engaging in protected whistleblowing because such a truncated analysis ignored a critical fact:  that the Camden project was winding down, "causing Elk to trim labor based upon seniority, a defined term of art under the CBA." Ibid.

Because the CEPA claim "cannot be evaluated absent review, consideration, and interpretation of the CBA and its terms," the panel concluded that LMRA preemption applied.  Ibid.  The panel added that Puglia's claim also was subject to NLRA preemption under Garmon's precedent.  Id. at 480-81.

We granted Puglia's petition for certification.  220 N.J. 573 (2015).  We also granted amicus curiae status to the New Jersey Association for Justice (NJAJ) and the Employers Association of New Jersey (EANJ).

II.

A.

Puglia argues that neither the LMRA nor the NLRA preempts his state-law claim and urges this Court to allow his CEPA claim to proceed in state court.

According to Puglia, Section 301 of the LMRA does not require preemption if a plaintiff's claims can be evaluated

11

without interpreting the CBA.  He maintains that his CEPA claim does not require interpretation of the CBA and thus sidesteps Section 301's preemptive reach.

Puglia contends that his CEPA claim is centered on whether he engaged in whistleblowing activity and whether he was terminated for engaging in that activity.  Those determinations, he reasons, do not require an analysis of the CBA's terms.  That Elk may have deviated from the seniority schedule set out in the CBA may provide evidence of a retaliatory motive, but it does not provide a need to interpret the CBA.  Importantly, even if Elk did not deviate from the seniority provisions, Puglia points out that a jury could still find a retaliatory motive sufficient for a CEPA cause of action.[2]

Puglia asserts that there is no breach-of-contract claim in his complaint, and he adds that neither Elk nor the Appellate Division can rewrite his complaint to add a CBA-based claim when one was not alleged by him in the first instance.  In sum, Puglia contends that to follow the Appellate Division's reasoning would prevent unionized employees from bringing claims

---

[2] In oral argument before this Court, Puglia underscored this point by conceding that were he permitted to proceed with his complaint, he would jettison any reliance on his complaint's mention of his seniority rights.  See infra at ___ (slip op. at 27-28).  He insists that his CEPA complaint does not require him to prove that his CBA seniority rights have been violated.

12

under CEPA simply because an adverse employment action might also have violated the CBA's just-cause provision.

Further, says Puglia, Garmon does not require preemption here either. First, Puglia argues that he did not engage in concerted activity within the meaning of Section 7. His complaints were about his wages, not about the payment, or nonpayment, of other employees' wages. Puglia further asks this Court to consider the purposes that guide preemption under the NLRA, explaining that the Prevailing Wage Act and CEPA are generally applicable state statutes that do not interfere with the collective bargaining process. In this case, Puglia emphasizes that his CEPA claim does not invoke arguably protected activity, implicating the right to organize.

B.

Elk maintains that Puglia's complaint rightfully was held to be preempted under both federal statutes.

According to Elk, Garmon preempts Puglia's CEPA claim because Puglia's actions after his wages were cut qualify as concerted activity. Elk highlights the joint nature of Puglia's initial complaint: Puglia and another laborer opened their paychecks at the same time and proceeded to inquire together as to why their wages dropped. In Elk's view, two employees joining together to protest their wages constitutes concerted activity and thus makes this a matter that the Board should

13

decide. Elk offers two other grounds for finding Puglia's actions concerted: (1) Puglia's complaints to Elk's management about wages raised a group or collective concern, and (2) Puglia's complaints invoked rights under the CBA. Any one of those rationales is sufficient, Elk reasons, to make Puglia's activity arguably concerted and thus within the Board's exclusive jurisdiction.

Elk also maintains that LMRA preemption precludes Puglia's state-law claim. Elk states that whether Puglia was properly laid off "cannot be separated from [his] CEPA claim" and that "[t]he two are inextricably intertwined since [Puglia] contends as part of his CEPA claim that his layoff was improper under the [u]nion contract." Because Puglia affirmatively made an issue of the CBA's lay-off provision, Elk contends that Puglia's complaint "naturally implicates the CBA."

According to Elk, the CBA seniority and lay-off provisions are also relevant in another way: They relate to Elk's defense. Because Puglia inserted the CBA into his CEPA claim by alleging that Elk strayed from the seniority provisions, Elk maintains that it becomes necessary to interpret those provisions to see whether Elk actually did so.

C.

The NJAJ supports Puglia's contention that his CEPA claim is not preempted. Concerning Section 301 preemption, the NJAJ

14

reiterates that it does not apply when a plaintiff asserts a pure statutory claim that exists independently of rights guaranteed under the CBA.  As for Garmon preemption, the NJAJ argues that it does not apply because Puglia did not avail himself of the NLRA's protections.  In any event, because CEPA is broad, remedial legislation that plays a locally critical role in protecting New Jersey workers, the NJAJ contends that it falls within a recognized local-concern exception to Garmon preemption as applied to these facts.

The EANJ focuses its argument on the NLRA and supports Elk's position that Garmon preemption is appropriate in these circumstances.  According to the EANJ, Puglia engaged in quintessential concerted activity:  His complaint about improper wages arose out of conditions of employment common to other employees.  Therefore, he should not be permitted to evade the NLRB's exclusive jurisdiction by refashioning his complaint as a CEPA claim.  The EANJ also asserts as an argument that Puglia performed no whistleblower activity.

### III.

The Supremacy Clause of the United States Constitution provides the basis for Congress's ability to enact laws governing labor relations that preempt state laws.  U.S. Const. art. VI, cl. 2 (providing that federal law "shall be the supreme Law of the Land"); see also Allis-Chalmers Corp., supra, 471

15

U.S. at 208, 105 S. Ct. at 1909, 85 L. Ed. 2d at 213 (citing Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L. Ed. 23 (1824)).  By virtue of the Supremacy Clause, "state laws that 'interfere with, or are contrary to the laws of congress, made in pursuance of the constitution' are invalid."  Wis. Pub. Intervenor v. Mortier, 501 U.S. 597, 604, 111 S. Ct. 2476, 2481, 115 L. Ed. 2d 532, 542 (1991) (quoting Gibbons, supra, 22 U.S. (9 Wheat.) at 211, 6 L. Ed. at 73).

Congressional intent is key in determining whether federal law preempts state law or action.  Allis-Chalmers Corp., supra, 471 U.S. at 208, 105 S. Ct. at 1909-10, 85 L. Ed. 2d at 213 (quoting Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S. Ct. 1185, 1190, 55 L. Ed. 2d 443, 450 (1978)).  Absent preempting language in a statute, courts sustain a local regulation "unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States."  Id. at 209, 105 S. Ct. at 1910, 85 L. Ed. 2d at 213-14 (quoting Malone, supra, 435 U.S. at 504, 98 S. Ct. at 1190, 55 L. Ed. 2d at 450).

With that background, we begin from a baseline that recognizes that minimum labor standards set by state law, such as minimum wages, are not preempted by the NLRA.  In 1985, the Supreme Court pronounced that conclusion in Metropolitan Life

16

Insurance Co. v. Massachusetts, 471 U.S. 724, 751, 105 S. Ct. 2380, 2395, 85 L. Ed. 2d 728, 747 (1985), albeit in the context of analyzing a different strand of NLRA preemption than the one in this appeal -- the so-called Machinists[3] preemption doctrine, which preempts state law in areas that Congress intended to leave unregulated.

The Court explained that the NLRA is designed to level the bargaining power between employers and employees, not to establish the "particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." Id. at 753, 105 S. Ct. at 2396, 85 L. Ed. 2d at 749. That goal was declared fully consistent with federal and state legislation that set a floor for certain terms subject to collective bargaining. Id. at 754, 105 S. Ct. at 2397, 85 L. Ed. 2d at 749-50. The Court explained that because minimum labor standards "affect union and nonunion employees equally," and because they "neither encourage nor discourage the collective-bargaining processes that are the subject of the NLRA," they have at most an "indirect effect on the right of self-organization established in the Act." Id. at 755, 105 S. Ct. at 2397, 85 L. Ed. 2d at 750. To find otherwise, the Court

_____

[3] Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp't Relations Comm'n, 427 U.S. 132, 96 S. Ct. 2548, 49 L. Ed. 2d 396 (1976).

17

stated, would exempt unionized employers from standards that state law has set for everyone else and would penalize workers for joining a union.  Id. at 755-56, 105 S. Ct. at 2397, 85 L. Ed. 2d at 750; see also Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 22, 107 S. Ct. 2211, 2223, 96 L. Ed. 2d 1, 18 (1987).

Thus, the New Jersey Legislature's policy choice to set a minimum labor standard in the Prevailing Wage Act and thereby guarantee that certain wages be paid to workers on public works projects is not preempted by federal law.  The more refined question here is whether complaints about violations of that minimum labor standard, and the concomitant State interest in curbing retaliation for such complaints, invoke preemption concerns.

The present case requires analysis under two separate types of preemption.  We turn first to the LMRA question.

IV.

A.

The Supreme Court's decision in Lingle v. Norge Division of Magic Chef, Inc., 486 U.S. 399, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988), is at the forefront of a Section 301 preemption analysis.  In Lingle, an employee claimed that she was discharged for filing a workers' compensation claim.  Id. at 402, 108 S. Ct. at 1879, 100 L. Ed. 2d at 416.  Illinois law provided a remedy for employees who were discharged for filing

18

workers' compensation claims; at the same time, the employee also was covered by a CBA, which protected her from termination absent just cause. Id. at 401, 108 S. Ct. at 1879, 100 L. Ed. 2d at 415-16. In considering the preemption question presented, the Seventh Circuit concluded that the employee's state-law retaliatory discharge claim was preempted by Section 301, reasoning that the same facts would be involved in both the state-law claim and the claim under the CBA. Id. at 402, 108 S. Ct. at 1879, 100 L. Ed. 2d at 416. However, the Supreme Court reversed that holding.

Summing up its prior cases on LMRA preemption, the Court set out the principle that guides a Section 301 preemption analysis:

> [I]f the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law (which might lead to inconsistent results since there could be as many state-law principles as there are States) is pre-empted and federal labor-law principles -- necessarily uniform throughout the nation -- must be employed to resolve the dispute.
>
> [Id. at 405-06, 108 S. Ct. at 1881, 100 L. Ed. 2d at 418-19.]

With respect to Lingle's claim, the Supreme Court observed that Illinois law required that the plaintiff prove that she was discharged and that "the employer's motive . . . was to deter [her] from exercising [her] rights under the [Illinois Workers'

19

Compensation] Act or to interfere with [her] exercise of those rights." Id. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 419 (quoting Horton v. Miller Chem. Co., 776 F.2d 1351, 1356 (7th Cir. 1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1641, 90 L. Ed. 2d 186 (1986)). Those questions were, said the Court, purely factual ones. Ibid. Neither required a trial court to construe a CBA term. Ibid. And an employer's defense that it had a non-retaliatory motive for the discharge was likewise a factual question. Id. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 420. The state-law claim was thus determined to be independent of the CBA. Ibid.

Recognizing that the Illinois claim "might well involve attention to the same factual considerations as the contractual determination of whether [the employee] was fired for just cause," the Court "disagree[d] with the [Seventh Circuit's] conclusion that such parallelism renders the state-law analysis dependent upon the contractual analysis." Id. at 408, 108 S. Ct. at 1883, 100 L. Ed. 2d at 420. That the state claim and the CBA claim "would require addressing precisely the same set of facts" does not alone force preemption, so long as the state claim can be adjudicated without an interpretation of the CBA. Id. at 410, 108 S. Ct. at 1883, 100 L. Ed. 2d at 421. Further, the Supreme Court stated that the presence of a broad CBA provision that protects against discriminatory or retaliatory

20

discharge -- a provision that may provide a remedy for conduct that violates state law -- "does not make the existence or the contours of the state-law violation dependent upon the terms of the private contract."  Id. at 413, 108 S. Ct. at 1884, 100 L. Ed. 2d at 423.

From Lingle, we glean that a retaliatory discharge claim can survive a Section 301 preemption analysis.  A collateral question, however, was not so neatly resolved.  It is less clear whether a defendant's claim that the CBA justified its negative employment action can preempt a plaintiff's otherwise independent state-law action.  In Lingle, the Court said that "[i]n the typical case a state tribunal could resolve either a discriminatory or retaliatory discharge claim without interpreting the 'just cause' language of a collective-bargaining agreement."  Ibid.  Some cases have touched on the extent to which a CBA-based defense can preempt a plaintiff's state-law claim.

In Caterpillar, Inc. v. Williams, 482 U.S. 386, 398-99, 107 S. Ct. 2425, 2432-33, 96 L. Ed. 2d 318, 331 (1987), the Supreme Court held that a state-law employment contract claim could not be removed to federal court because the defendant attempted to use a CBA as a defense.  The plaintiff employees began employment covered under a CBA, moved to salaried or management positions outside of the CBA, and were downgraded back to CBA-

21

level positions. Id. at 388-89, 107 S. Ct. at 2427-28, 96 L. Ed. 2d at 324-25. The employees filed a state-law action, claiming that the employer breached the employment contract in place during the time that the employment relationship was not covered by the CBA. Id. at 390, 107 S. Ct. at 2428, 96 L. Ed. 2d at 325. The defendant employer removed the case to federal court, stating a defense that the individual employment agreements merged into the CBA thereby requiring an interpretation of the CBA. Id. at 390, 107 S. Ct. at 2428, 96 L. Ed. 2d at 325-26.

On appeal, the Supreme Court said removal was improper and that general federal jurisdiction principles compelled that result. The Court explained that a defendant can remove a state-court action to federal court "only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Id. at 392, 107 S. Ct. at 2429, 96 L. Ed. 2d at 327. A federal defense, standing alone, cannot support removal jurisdiction. Id. at 393, 107 S. Ct. at 2430, 96 L. Ed. 2d at 327. If, however, a state-law claim is substantially dependent on a CBA analysis, it is converted into a federal claim, thus making removal appropriate. Id. at 394, 107 S. Ct. at 2430, 96 L. Ed. 2d at 328.

In Caterpillar, the Supreme Court recognized that the state-law employment contract claims in that matter were not

22

based on the CBA and held that a federal element in a defense did not change that.  Id. at 396-97, 107 S. Ct. at 2431-32, 96 L. Ed. 2d at 330.  The Court stated that although a state court may have to interpret the CBA when a defense is based on the terms of that agreement in evaluating the state-law claim, "the presence of a federal question, even a [Section] 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule."  Id. at 398, 107 S. Ct. at 2433, 96 L. Ed. 2d at 331.

Caterpillar's pronouncement about review of a purported CBA-based defense came in the context of a removal case.  The Court specifically left open whether the CBA-rooted defense could preempt the state-law claim, adding in a footnote:  "We intimate no view on the merits of this or any of the pre-emption arguments discussed above.  These are questions that must be addressed in the first instance by the state court in which [the plaintiffs] filed their claims."  Id. at 398 n.13, 107 S. Ct. at 2433 n.13, 96 L. Ed. 2d at 331 n.13.  Caterpillar thus leaves open the possibility that a CBA-based defense might preempt a claim but holds that such a defense cannot provide a basis for removal jurisdiction.  Although some federal courts have taken that view, others have not, reading Caterpillar instead to narrow "both substantive preemption under [Section] 301 and removal jurisdiction . . . in cases in which the employer raises

23

a defense based on the collective bargaining agreement." Katherine Van Wezel Stone, The Legacy of Industrial Pluralism: The Tension Between Individual Employment Rights and the New Deal Collective Bargaining System, 59 U. Chi. L. Rev. 575, 601-02 (1992) (emphasis added) (collecting cases on both sides).

A more recent Supreme Court decision fortifies the view that such a CBA-based defense is ordinarily insufficient to preempt an independent state-law action. In Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 266, 114 S. Ct. 2239, 2251, 129 L. Ed. 2d 203, 220 (1994), the Court explained that "Lingle teaches that the issue to be decided in this action -- whether the employer's actions make out the element of discharge under Hawaii law -- is a 'purely factual question.'" With that, the Court rejected the employer's argument that the state-law claim "require[d] a determination whether the [plaintiff employee's] discharge, if any, was justified by [the plaintiff's] failure to sign the maintenance record, as the CBA required him to do." Ibid. Although that determination would be necessary to sustain a claim alleging a CBA violation (hence why such a claim was dismissed as preempted), "[t]he state tort claims, by contrast, require only the purely factual inquiry into any retaliatory motive of the employer." Ibid. It appears therefore that a fact-based inquiry is appropriate when assessing a purported

24

CBA-based defense by an employer asserting preemption under Section 301.[4]

B.

To evaluate Section 301 preemption in this matter, we turn to Puglia's complaint.  It is there that one must look to find the source of the right that he alleges Elk infringed.  From that, we can determine whether Puglia's claim requires an interpretation of the CBA.

Puglia alleged a CEPA claim.  To prove a CEPA claim, Puglia must show only that (1) he reasonably believed defendants were violating a law, rule, or public policy; (2) that he performed a whistleblowing activity; (3) that an adverse employment action was taken against him; and (4) that a causal relationship exists between the whistleblowing activity and the adverse employment action.  See Dzwonar v. McDevitt, 177 N.J. 451, 462 (2003).  Whether Puglia performed a whistleblowing activity in reporting the alleged failure by Elk to abide by Prevailing Wage Act requirements, and whether Elk retaliated against Puglia for doing so are factual questions, untied to any interpretation of

---

[4] Elk points to Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 481 (1991), in which we said that "any evaluation of [the employer's] defense to [the plaintiff's] [Law Against Discrimination] claims require[d] an evaluation of the terms of the collective-bargaining agreement."  That portion of Maher involved a different statute and preceded the Supreme Court's decision in Hawaiian Airlines.  We do not find it persuasive in the present matter.

25

the CBA.  CEPA creates independent rights.  Puglia's CEPA cause of action is unaffected by whether the CBA was violated; it asks only whether Puglia's whistleblowing activity played a role in his termination.

That Puglia could have sought relief based on provisions of the CBA -- perhaps under the provision that guaranteed there would be no wage decreases without mutual agreement or perhaps under the seniority provision -- does not change the analysis. Mere factual parallelism between a CEPA claim and a CBA-based claim does not make a CEPA claim dependent on the CBA.  Puglia is not asking New Jersey courts to use New Jersey law to define the ins and outs of his bargained-for employment relationship with Elk.  He is asking our courts to enforce his rights under CEPA, independent and apart from his bargained-for employment conditions.  That, our courts can do.

But there is an extra wrinkle in this appeal -- paragraph 29 of Puglia's complaint.  In that paragraph, Puglia alleged: "In December of 2010, near the close of the Camden job, plaintiff was 'laid off' by the defendants, despite the fact that plaintiff had more seniority with the company than did other employees who were not laid off and who remained employed after plaintiff's lay off."  The CBA's seniority provision is not, however, a simple first-man-in-last-man-out formula.  It is more nuanced.  It provides that "[i]n all cases of promotion,

demotion, lay-off, recalls and bumping," the employer would consider a number of factors, including the employee's classification, his ability, and his qualifications. Then, with all other things being equal, "the length of continuous service shall govern."

It is far from clear that Puglia claimed a violation of the CBA in paragraph 29. He was making a factual allegation: He was more senior than other employees who were not let go. That was one piece of information, among many, to be considered in the context of Elk's decision to lay him off. That Puglia mentioned seniority in his deposition does not alter the substance of his claim. Nor does it inject a question of CBA interpretation into the factual questions at the heart of a CEPA claim. At his deposition, Puglia said that he was more senior than everyone on the job, save the operator, and thus, in his view, should have been the last one to leave. We do not know whether he may have had a claim under the CBA's seniority provision because, as master of his complaint, he chose not to pursue it. Having a claim under the CBA does not void state-law remedies that are independent of the CBA. The employer's attorney cannot change that by the course of his questioning at a deposition.

Consistent with his recognition of the proofs necessary in a CEPA claim, Puglia's counsel at oral argument conceded that

27

Puglia would be satisfied to proceed without any mention of the seniority provision in his case-in-chief.  We hold Puglia to that representation in any further proceedings.

In holding Puglia's CEPA claim preempted, the Appellate Division here said that "Elk's assessment of his seniority status, as compared to that of his colleagues who continued working, can only be reviewed by an analysis of the CBA's factors."  Puglia, supra, 437 N.J. Super. at 478.  The CBA was bound up with any CEPA claim, in the panel's view, because the work project was winding down, "causing Elk to trim labor based upon seniority, a defined term of art under the CBA."  Ibid.  Puglia's CEPA claim could not, said the panel, be reviewed without interpretation of the CBA.  Ibid.  The panel's analysis injected the CBA's seniority provision as a potential defense -- that Elk laid off Puglia in accordance with the seniority provision.  Then the trial court would be required to interpret the CBA, thus preempting the claim.

We disagree with the panel's reasoning that Elk's potential defense changes the preemption calculus in this matter.  Again, we look to what a plaintiff must prove in a CEPA action.  Even if Elk could establish that the CBA justified the firing, Puglia may still prevail on his CEPA claim.  See, e.g., Winters v. N. Hudson Reg'l Fire & Rescue, 212 N.J. 67, 96 (2012) (recognizing right to bring CEPA retaliation action based on mixed-motive

28

theory).  CEPA claims focus on whether an employer acted with a retaliatory motive -- a purely factual question.  Interpretation of the CBA to evaluate an employer's potential defense is not outcome determinative in such cases.  See Nelson v. Cent. Ill. Light Co., 878 F.2d 198, 202 (7th Cir. 1989) (recognizing that in retaliatory discharge case, court does not need to determine whether proffered non-retaliatory motive "was a legitimate one[;] [i]t must simply determine whether such a motive exists -- not whether, as a matter of law, the collective bargaining agreement justifies such a motive" (quoting Bettis v. Oscar Mayer Foods Corp., 878 F.2d 192, 197 (7th Cir. 1989))).

The model jury charge for CEPA claims drives that point home.  CEPA plaintiffs must "prove that it is more likely than not that defendant engaged in intentional retaliation against plaintiff because plaintiff" engaged in whistleblowing activity. See Model Jury Charges (Civil), § 2.32 "New Jersey Conscientious Employee Protection Act" (2014).  That does not mean that retaliation has to be the only factor driving the termination. A jury can find that the employer "had more than one reason or motivation for its actions."  Ibid.  The model charge goes on to explain that the jury can find that the employer was motivated by retaliatory and non-retaliatory motives.  Ibid.  The plaintiff need "only prove that retaliation played a role in the decision and that it made an actual difference in defendant's

29

decision." Ibid. (emphasis added). But if the employer would have made the same decision in the absence of the plaintiff's whistleblowing activity, then the employer wins. Ibid. In Puglia's potential CEPA claim, the critical question was whether he could "prove[] that it is more likely than not that [Elk] unlawfully retaliated against him . . . for his . . . [complaints about his wages]." Ibid.; see also Donofry v. Autotote Sys., Inc., 350 N.J. Super. 276, 296 (App. Div. 2001) ("Plaintiff's ultimate burden of proof is to prove by a preponderance of the evidence that his protected, whistleblowing activity was a determinative or substantial, motivating factor in defendant's decision to terminate his employment -- that it made a difference. Plaintiff need not prove that his whistleblowing activity was the only factor in the decision to fire him.").

Employers often argue that a CBA provides a legitimate motive for a challenged adverse employment decision. At the most basic level, an employer can simply say that it possessed just cause (a common provision in CBAs) to terminate an employee asserting a wrongful termination claim under state law. If a CBA-based defense could always drive Section 301 preemption, employers could substantially widen the substantive sweep of that doctrine. And they could do so simply by claiming that the CBA provided a perfectly good reason for the negative employment

30

action.  The employee could not respond because a response would necessitate an interpretation of the CBA.  See Stephanie R. Marcus, Note, The Need for a New Approach to Federal Preemption of Union Members' State Law Claims, 99 Yale L.J. 209, 226-27 (1989) (recognizing that allowing employer to preempt independent state-law claim by raising CBA-based defense "would encourage employers to assert invalid defenses to defeat employees' state law claims").

CEPA claims, like Puglia's, turn on questions that remain factually based in the face of an employer's claim that it acted lawfully under the CBA.  In deciding whether an employer acted with a retaliatory motive in a specific CEPA claim, we conclude that it is not necessary to determine whether the employer correctly based its action on the CBA.  Other courts also recognize that the outcome-determinative question is whether the employer acted with a retaliatory motive.  See Meyer v. Schnucks Mkts., Inc., 163 F.3d 1048, 1051 (8th Cir. 1998); Smolarek v. Chrysler Corp., 879 F.2d 1326, 1333-34 (6th Cir.), cert. denied, 493 U.S. 992, 110 S. Ct. 539, 107 L. Ed. 2d 537 (1989).

In so concluding in respect of Puglia's claim, we find support in the language of Section 301.  Section 301(a) grants the federal courts jurisdiction over "[s]uits for violations of contracts between an employer and a labor organization representing employees."  A complaint that alleges a violation

31

of state law is not the necessary equivalent of a suit claiming a violation of a labor contract.  A federal defense does not change that analysis "for the very good reason that a defendant's defensive positions are irrelevant to the issue whether a plaintiff's claim is, in form or substance, one for violation of a labor contract."  McCormick v. AT&T Tech., Inc., 934 F.2d 531, 543 (4th Cir. 1991) (Phillips, J., dissenting), cert. denied, 502 U.S. 1048, 112 S. Ct. 912, 116 L. Ed. 2d 813 (1992).  To us, this is a fairness issue, as the facts of this case make clear.  An employer should not be permitted to rewrite an employee's complaint and secure preemption of that complaint by leading that employee down the primrose path at a deposition.  Just so, an employer cannot secure preemption of a CEPA claim by asserting as a defense that it acted in accord with the CBA's seniority provision -- at least not without some careful factual analysis of that defense.

In this matter, we hold that Puglia's claim is not preempted under Section 301 of the LMRA.

## V.

Elk also contends that Puglia's CEPA claim is preempted by the NLRA.  The Supreme Court set out the modern contours of that form of labor-law preemption in Garmon.

### A.

#### 1.

32

In Garmon, supra, 359 U.S. at 238-39, 79 S. Ct. at 775-76, 3 L. Ed. 2d at 778-79, a California court awarded damages to an employer under state tort law for union picketing that the California Supreme Court determined to be an unfair labor practice. The decision from the California court came after the Board declined to assert jurisdiction. Id. at 238, 79 S. Ct. at 775-76, 3 L. Ed. 2d at 779. The question presented to the United States Supreme Court asked "whether the California court had jurisdiction to award damages arising out of peaceful union activity which it could not enjoin." Id. at 239, 79 S. Ct. at 776, 3 L. Ed. 2d at 780.

The Court started with the concerns animating preemption. Justice Frankfurter explained that in charting the extent of preemption in the labor-law context "we have been concerned with delimiting areas of potential conflict; potential conflict of rules of law, of remedy, and of administration." Id. at 241-42, 79 S. Ct. at 778, 3 L. Ed. 2d at 781. Administration of labor policy was entrusted to the Board, "a centralized administrative agency, armed with its own procedures, and equipped with its specialized knowledge and cumulative experience." Id. at 242, 79 S. Ct. at 778, 3 L. Ed. 2d at 781.

Because administration is central to regulation, the Court recognized that the preemption analysis necessarily focuses on the activity that states seek to regulate instead of the method

33

of regulation adopted. Id. at 243, 79 S. Ct. at 778, 3 L. Ed. 2d at 782. Accordingly, the Court announced a broad preemption rule: When state law attempts to regulate conduct that is arguably protected or arguably prohibited under the NLRA, state jurisdiction must yield. Id. at 244, 79 S. Ct. at 779, 3 L. Ed. 2d at 782. That preemption rule was held to apply regardless of whether the states acted through laws of general applicability or laws aimed at labor relations. Ibid.

As Garmon explained, the California court based its damage award on its view that the union conduct was an unfair labor practice. Id. at 245, 79 S. Ct. at 779, 3 L. Ed. 2d at 783. But that was not its call to make; nor was it a decision for the Supreme Court. Id. at 245, 79 S. Ct. at 779-80, 3 L. Ed. 2d at 783. Because the activity was arguably protected or prohibited by the NLRA, the Supreme Court declared that both state and "federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." Id. at 245, 79 S. Ct. at 780, 3 L. Ed. 2d at 783.

Importantly, the Garmon Court recognized exceptions to its preemption formula. Those exceptions allowed state courts to retain jurisdiction when "the activity regulated was a merely peripheral concern of the Labor Management Relations Act" or when "the regulated conduct touched interests so deeply rooted

34

in local feeling and responsibility." Id. at 243-44, 79 S. Ct. at 779, 3 L. Ed. 2d at 782. Commenting on the latter, the Court said that states have been allowed to enjoin or "to grant compensation for the consequences, as defined by the traditional law of torts, of conduct marked by violence and imminent threats to the public order." Id. at 247, 79 S. Ct. at 781, 3 L. Ed. 2d at 784. In those cases, the state interest was compelling and the "maintenance of domestic peace [was] not overridden in the absence of clearly expressed congressional direction." Ibid.

2.

Although the Act does not define "concerted activities," the Board and federal courts have read that term broadly. Both individual and group activity can be "concerted." Concerted activity "embraces the activities of employees who have joined together in order to achieve common goals." NLRB v. City Disposal Sys., Inc., 465 U.S. 822, 830, 104 S. Ct. 1505, 1511, 79 L. Ed. 2d 839, 849 (1984). So too does an employee engage in concerted activity when he brings a group concern to management's attention. See Int'l Transp. Serv., Inc. v. NLRB, 449 F.3d 160, 166 (D.C. Cir. 2006).

Supreme Court decisions on the subject also go beyond those definitions. The Supreme Court has held that individual invocation of a right guaranteed in the CBA could qualify as concerted activity. City Disposal Sys., supra, 465 U.S. at 831-

35

32, 104 S. Ct. at 1511-12, 79 L. Ed. 2d at 849-50 (approving of Board's Interboro doctrine). The Court said that a right grounded in the CBA grew out of a collective process, "beginning with the organization of a union, continuing into the negotiation of a collective-bargaining agreement, and extending through the enforcement of the agreement." Id. at 831-832, 104 S. Ct. at 1511, 79 L. Ed. 2d at 849. Without the prior collective activity bringing about the union contract, a single employee could not invoke rights created by that agreement. Id. at 832, 104 S. Ct. at 1511, 79 L. Ed. 2d at 849. Accordingly, when an employee invokes such a right, "he does not stand alone." Id. at 832, 104 S. Ct. at 1511, 79 L. Ed. 2d at 850.

Under a Garmon analysis, we need not be certain whether the Board would classify activity as concerted under Section 7. It need only be arguable; that is, there need only be a reasonable possibility that the Board could so decide. Because of the wide-ranging activities that could be called concerted, and because the activity at issue need only be arguably concerted to cut off state-court jurisdiction, Garmon casts a wide preemption net. So, the Supreme Court has drawn the brakes on Garmon's broad preemption rule.

In Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 182, 98 S. Ct. 1745, 1750, 56 L. Ed. 2d 209, 216 (1978), a union picketed on the property

36

of a Sears department store.  The picket line was established because some carpentry work was performed by nonunion workers.  Ibid.  Sears demanded that the union picketers leave the property, but the union refused.  Id. at 182-83, 98 S. Ct. at 1750, 56 L. Ed. 2d at 216.  Sears filed a complaint in a California trial court seeking to enjoin the trespass.  Id. at 183, 98 S. Ct. at 1750, 56 L. Ed. 2d at 216.  The trial court entered a temporary restraining order enjoining the picketing, and, after hearing argument on whether the picketing was protected by federal law, the court entered a preliminary injunction.  Id. at 183, 98 S. Ct. at 1750, 56 L. Ed. 2d at 216-17.

The California Supreme Court reversed.  "[B]ecause it was intended to secure work for [u]nion members and to publicize Sears' undercutting of the prevailing area standards for the employment of carpenters," the picketing was arguably protected under Section 7.  Id. at 184, 98 S. Ct. at 1751, 56 L. Ed. 2d at 217.  The picketing was also arguably an unfair labor practice prohibited by Section 8.  Ibid.  That determination would hinge on whether "the [u]nion had engaged in recognitional picketing subject to [Section] 8(b)(7)(C) of the Act, which could not continue for more than [thirty] days without petitioning for a representation election."  Ibid. (internal citation omitted).  The question before the United States Supreme Court was to what

37

extent states could enforce their trespass laws against union picketing, which was either arguably protected or arguably prohibited by the NLRA. Ibid.

The Court's analysis began with the Garmon rule but proceeded to explain that its precedents have eschewed a literal application of that rule, focusing instead on the "'nature of the particular interests being asserted and the effect upon the administration of national labor policies' of permitting the state court to proceed." Id. at 189, 98 S. Ct. at 1753, 56 L. Ed. 2d at 220 (quoting Vaca v. Sipes, 386 U.S. 171, 180, 87 S. Ct. 903, 911, 17 L. Ed. 2d 842, 852 (1967)). Those interests, the Court said, split based on whether a case fell on either the arguably protected or the arguably prohibited side of Garmon preemption. Id. at 190, 98 S. Ct. at 1754, 56 L. Ed. 2d at 221.

The concern animating federal preemption for cases that fall on the arguably prohibited side of the line is one of primary jurisdiction: "The conflict lies in remedies . . . . [W]hen two separate remedies are brought to bear on the same activity, a conflict is imminent." Id. at 193, 98 S. Ct. at 1755, 56 L. Ed. 2d at 223 (alteration in original) (quoting Garner v. Teamsters, 346 U.S. 485, 498-99, 74 S. Ct. 161, 170, 98 L. Ed. 228, 244 (1953)). Although that rationale carries the most weight with "state laws regulating the relations between

employees, their union, and their employer," it can also apply to generally applicable laws.  Ibid.

The "critical inquiry" is thus "whether the controversy presented to the state court is identical to . . . or different from . . . that which could have been, but was not, presented to the Labor Board."  Id. at 197, 98 S. Ct. at 1757, 56 L. Ed. 2d at 225.  Importantly, the Court stated that only when the two controversies are the same does state-court jurisdiction risk "interfer[ing] with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the Garmon doctrine was designed to avoid."  Id. at 197, 98 S. Ct. at 1757-58, 56 L. Ed. 2d at 225-26.  That interference is most likely when the state law relates to labor relations, as a generally applicable law is "less likely to generate rules or remedies which conflict with federal labor policy than the invocation of a special remedy under a state labor relations law."  Id. at 197 n.27, 98 S. Ct. at 1758 n.27, 56 L. Ed. 2d at 226 n.27.

Comparing the controversy that Sears could have presented to the Board to the trespass action before the state court, the Court said they were not the same.  Id. at 198, 98 S. Ct. at 1758, 56 L. Ed. 2d at 226.  The action before the Board would have asked "whether the picketing had a recognitional or work-reassignment objective," and the answer to that question would have turned on difficult factual and legal considerations.

39

Ibid. The state-law action instead would have focused on only the location of the picketing, a different question entirely. Ibid. The considerations that compel preemption when activity is arguably prohibited therefore did not apply. Ibid.

Different considerations were in play for the Supreme Court in assessing whether the arguably protected nature of the picketing required preemption. When the states look to regulate arguably protected conduct, the threat of interference with federal law comes into consideration and "is the principal concern of the second branch of the Garmon doctrine." Id. at 203, 98 S. Ct. at 1760, 56 L. Ed. 2d at 229. The worry is that the state court will prohibit conduct that is protected under federal law. Id. at 203, 98 S. Ct. at 1760-61, 56 L. Ed. 2d at 229. Accordingly, the Court reasoned that "the acceptability of 'arguable protection' as a justification for pre-emption in a given class of cases is, at least in part, a function of the strength of the argument that [Section] 7 does in fact protect the disputed conduct." Id. at 203, 98 S. Ct. at 1761, 56 L. Ed. 2d at 229.

Because it would be the rare case in which trespassory picketing was protected under Section 7, the Court said that "[w]hatever risk of an erroneous state-court adjudication does exist [was] outweighed by the anomalous consequence of a rule which would deny the employer access to any forum in which to

40

litigate either the trespass issue or the protection issue in those cases in which the disputed conduct is least likely to be protected by [Section] 7." Id. at 206-07, 98 S. Ct. at 1762, 56 L. Ed. 2d at 231.

Sears thus refined Garmon. The arguably protected or arguably prohibited nature of conduct, by itself, is not enough to preempt state jurisdiction. The underlying rationales that support preemption must be present, and Sears clarified that those rationales differ based on whether state law is attempting to regulate conduct that is either arguably protected or arguably prohibited. See Healthcare Ass'n of N.Y. State, Inc. v. Pataki, 471 F.3d 87, 95 (2d Cir. 2006) ("Justice Stevens [in Sears] separated out what Justice Frankfurter had joined, distinguishing the substantive and remedial concerns from the primary jurisdiction concern and prescribing different treatments for each."). Even if conduct is arguably protected or prohibited, and even if the rationales supporting preemption are present, the exceptions that Garmon carved out from its otherwise-broad preemption doctrine provide one last step of the preemption analysis.

3.

Within that framework, some courts from other jurisdictions have considered a question similar to that which is presented here: whether the NLRA preempts an employee's claim that he was

41

terminated in retaliation for complaining about wages.  We identify them for the sake of completeness.

In Hume v. American Disposal Co., 880 P.2d 988, 991 (Wash. 1994), cert. denied, 513 U.S. 1112, 115 S. Ct. 905, 130 L. Ed. 2d 788 (1995), several employees -- drivers for the defendants, a number of waste collection companies -- became aware that they were entitled to overtime compensation under Washington law.  In response to an investigation by the State Department of Labor, the employers settled the overtime claims, overhauled their overtime policy, and began clocking employees.  Ibid.  But after the investigation, "the relationship between the defendants and their employees continued to deteriorate."  Ibid.  The employees eventually filed suit under a Washington statute that prohibited employer retaliation against employees who assert wage claims. Ibid.

The Washington Supreme Court was "not convinced the statute at issue . . . attempt[ed] to regulate the employees' 'protected concerted activities' under the NLRA."  Id. at 992. Although complaining about the lack of overtime pay may be protected activity under the NLRA, the court said that "the Washington statute does not attempt to regulate employee grievance procedures."  Ibid.  The statute instead "regulate[d] employer actions by prohibiting retaliatory discharge."  Ibid.  However, the court declined to rest its holding on that basis, finding

42

that, in any event, the retaliation statute touched a deeply rooted local concern and thus was exempted from Garmon preemption. Ibid.

In making that determination, the court looked to the potential for interference between the state statute and the federal regulatory scheme. Finding such interference unlikely, the court explained that while "an NLRB inquiry would focus on whether the [employees'] overtime wage claims were protected 'concerted activity,' the state cause of action focuse[d] instead on whether the employees were discharged in retaliation for their overtime claims." Id. at 993. The state cause of action was therefore "different from that which could have been, but was not, presented to the Labor Board." Ibid. Next, the court detailed that even if asserting an overtime claim is protected concerted activity under the NLRA, the statute does not regulate that conduct; "[i]f anything, the statute regulate[d] employer activity prohibited by the NLRA and, thus, [was] less likely to interfere with the federal scheme and require preemption under the Garmon doctrine." Ibid. Last, because the Washington statute contained a clear legislative condemnation of retaliation against an employee who asserts an overtime claim, the employees' claims were based on a statute that "reflect[ed] a legitimate local concern rooted in a strong and clearly articulated public policy." Ibid.

43

Not all courts have concluded similarly.  See, e.g., Henry v. Laborers' Local 1191, 848 N.W.2d 130, 145-46 (Mich. 2014) (holding that NLRA preempted employees' whistleblower claim alleging retaliation in response to complaints about wages and working conditions because wages and working conditions "are prototypical issues of dispute under the NLRA" and further holding that local-concern exception did not apply); Anco Const. Co. v. Freeman, 693 P.2d 1183, 1185 (Kan. 1985) (preempting employee's claim that he was discharged for complaints about not being paid proper wages under Davis-Bacon Act, reasoning that "the NLRA clearly protects and covers the alleged retaliatory discharge as an unfair labor practice in this case since it involved a wage dispute covered by the NLRA").

## B.

Elk says that Puglia's conduct qualifies as concerted activity and is therefore preempted.  Even if it cannot be said that Puglia's actions here are "concerted" with near-total certainty, that is not what Garmon asks.  Garmon asks only whether it is arguable, for it is left to the Board to define (subject to appellate review) with precision what activities are protected by Section 7.  The state court must give way if it is a close question.

We think it beyond real dispute that Puglia's conduct was at least arguably protected under Section 7.  Puglia and

44

Barrette jointly complained about their wages to management. And Puglia communicated with other employees about the wage decrease and proceeded to further discuss the issue with management, protesting the reduction in "our" wages. If Garmon's arguably protected/arguably prohibited analysis was the last word, this would be a straightforward case. By complaining about his wages with another worker, or by bringing a group complaint to management, Puglia engaged in arguably protected concerted activity. And by allegedly firing Puglia in response, Elk arguably engaged in an unfair labor practice prohibited by Section 8. But the Supreme Court has pulled back from Garmon's broad brush, refocusing the analysis on the concerns animating labor-law preemption in the first place.

CEPA regulates employer activity -- activity that would be arguably prohibited by the NLRA. The concern in this branch of Garmon preemption is that state-court jurisdiction would interfere with the Board's primary jurisdiction. We thus ask whether Puglia's CEPA claim is identical to the claim that he could have, but did not, present to the Board.

The Supreme Court's post-Garmon decisions demonstrate the Court's willingness to closely examine these preemption situations and look beyond whether the state-court dispute and the controversy that could have been, but was not, presented to the Board grew out of the same facts. The Court has looked to

45

the proofs required in the different actions in the different forums.  For example, in Sears, the Court said the state-court trespass claim was not the same as the NLRA claim that could have been presented to the Board.  The trespass action cared only about the location of picketing.  Before the Board, however, any claim would have dealt with questions about the purposes of the picketing and interpretation of the Act.  That difference was enough to allow state-court jurisdiction without unduly interfering with the Board's primary jurisdiction.  It appears that what is explicit in the Section 301 preemption context can be regarded as implicit in the NLRA realm:  factual overlap does not drive the preemption analysis; the proofs do.

In our view, a similar approach here shows enough of a gap between the proofs in Puglia's CEPA action and an unfair-labor-practice dispute to elude Garmon preemption.  See Archibald Cox, Recent Developments in Federal Labor Law Preemption, 41 Ohio St. L.J. 277, 285 (1980) ("The more widely the applicable state substantive law differs from the federal law, the greater will be the differences in the proof required to make a case for judicial relief.").  Puglia's CEPA claim would center on whether he engaged in whistleblowing activity and whether that activity played a role in his termination.  The NLRA claim would instead focus on whether Puglia engaged in concerted activity aimed at the conditions of his employment.  Yet concerted activity would

46

play no role in a CEPA action.  Because we cannot say that the two are "identical," we conclude that the risk of infringing on the Board's primary jurisdiction in this case does not demand preemption.

That conclusion is buttressed by CEPA's general applicability.  Garmon, supra, said that the distinction between laws of general applicability and laws geared to regulating labor relations was irrelevant.  359 U.S. at 244, 79 S. Ct. at 779, 3 L. Ed. 2d at 782.  Sears, supra, repeated the instruction that such a distinction was not dispositive but added that generally applicable laws by their very nature are "less likely to generate rules or remedies which conflict with federal labor policy than the invocation of a special remedy under a state labor relations law."  436 U.S. at 197 n.27, 98 S. Ct. at 1758 n.27, 56 L. Ed. 2d at 226 n.27.  We agree.

And like the Washington Supreme Court, we believe that when the State's interests in enforcing CEPA in a factual setting like this one -- whistleblowing activity arising out of a prevailing wage dispute -- are balanced against any potential interference with the federal labor scheme, the State's interests win out.  New Jersey's interest in enforcing CEPA runs deep.  See Mehlman v. Mobil Oil Corp., 153 N.J. 163, 179 (1998) (recognizing that at the time of enactment, CEPA was described "as the most far reaching 'whistleblower statute' in the

47

nation"). Any interference with the federal scheme by allowing this CEPA claim to go forward in state court would be de minimis. CEPA does not affect the bargaining position between management and labor -- the balance that the NLRA seeks to bring into equipoise. CEPA claims exist regardless of an employee's union membership. And, generally stated, CEPA claims are individual claims, seeking to validate an individual's right to be free from workplace retaliation after raising a legitimate public policy issue.

More pointedly for the setting and holding of this matter, the Supreme Court has specifically held that generally applicable state and local laws that set minimum labor standards are not preempted by federal law. See Metro. Life Ins., supra, 471 U.S. at 756, 105 S. Ct. at 2397, 85 L. Ed. 2d at 750. If an employee can allege a violation of those state minimum labor standards without being preempted by federal law, then it follows that allegations of retaliatory discharge based on whistleblower conduct in response to a violation of those standards should not be preempted. CEPA provides a vehicle to fulfill compliance with those legislatively set minimum labor standards. To find such statutes like New Jersey's Prevailing Wage Act are not preempted by federal law, but that allegations of retaliatory discharge in response to complaints under those

48

statutes are, would undermine the purpose of those statutes and leave employees with a half-baked remedy.

In this matter, we hold that the NLRA does not preempt Puglia's CEPA claim.

VI.

The judgment of the Appellate Division is reversed.


CHIEF JUSTICE RABNER; JUSTICES ALBIN, PATTERSON, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE LaVECCHIA's opinion. JUSTICE FERNANDEZ-VINA did not participate.