NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-0886-13T1


SALVATORE PUGLIA,

     Plaintiff-Appellant,

v.

ELK PIPELINE, INC., ELK
PIPELINE, INC. t/a and/or d/b/a
CROWN PIPELINE CONSTRUCTION
COMPANY, CROWN PIPELINE
CONSTRUCTION COMPANY,
THOMAS MECOUCH, individually
and as the corporate alter ego,

     Defendants-Respondents.

---

> **APPROVED FOR PUBLICATION**
>
> **October 10, 2014**
>
> **APPELLATE DIVISION**

Argued July 16, 2014 – Decided  October 10, 2014

Before Judges Messano,[1] Lihotz and Guadagno.

On appeal from the Superior Court of New Jersey, Law Division, Gloucester County, Docket No. L-1046-11.

Deborah L. Mains argued the cause for appellant (Costello & Mains, P.C., attorneys; Ms. Mains, on the brief).

Douglas Diaz argued the cause for respondents (Archer & Greiner, P.C., attorneys; Mr. Diaz and Tracy Asper Wolak, on the brief).

---

[1]   Judge Messano did not participate in oral argument.  He joins the opinion with counsel's consent.  R. 2:13-2(b).

The opinion of the court was delivered by

LIHOTZ, P.J.A.D.

Plaintiff Salvatore Puglia appeals from the Law Division's grant of summary judgment, dismissing his complaint alleging his former employer, defendants Elk Pipeline, Inc. (Elk) and Elk's President Thomas Mecouch (collectively defendants) retaliated against him for reporting Elk's alleged violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. Plaintiff maintained Elk failed to properly pay overtime and remuneration at an applicable rate which violated the New Jersey Prevailing Wage Act (PWA), N.J.S.A. 34:11-56.25 to -56.47, and his complaints resulted in his lay-off despite his level of seniority. The Law Division rejected plaintiff's claims as cognizable under CEPA, instead finding they were based on an interpretation of the parties' collective bargaining agreement (CBA), and redress was governed by federal law. We agree and affirm.

I.

We recite the facts found in the summary judgment record viewed in a light most favorable to plaintiff. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995). Plaintiff was employed by Elk as a laborer from October 2, 2006 to December 16, 2010. During that time, plaintiff was assigned

to work on a sewer reconstruction project located in the City of Camden (the project). It is undisputed that the project was a public works project as defined in the PWA.

As a member of the International Association of Machinists and Aerospace Workers, AFL-CIO, Local Lodge S-76, plaintiff's employment was subject to a CBA, negotiated between Elk and the union. The CBA was effective from June 28, 2004 to February 15, 2010, but remained binding "thereafter from year to year unless either party" gave notice prior to the expiration date of an "intention to modify or terminate the agreement."

In January 2010, plaintiff noticed his hourly rate of pay was reduced from what he had previously received. He believed the rate of pay was less than the prevailing wage to which he was entitled. Plaintiff and another laborer, Robert Barrette, immediately challenged the reduced rate of pay by complaining to their supervisor, Eric Larsen, who referred them to Michael Tedesco, Elk's project manager.

Plaintiff and Barrette next complained to Tedesco about the pay cut. Tedesco stated Mecouch directed several laborers be paid at the apprenticeship level. Tedesco explained he objected, telling Mecouch Elk had no approved apprenticeship program for the project. Mecouch did not change his position.

3                                                    A-0886-13T1

Therefore, Tedesco recommended plaintiff speak directly to Mecouch, which he did in late January 2010.

In summer 2010, after his pay rate was not restored, plaintiff formally filed a complaint with the New Jersey Department of Labor. About this time, plaintiff contends Mecouch, through Tedesco, instructed him and other employees to "lie to state inspectors" if asked about their rate of pay.

Plaintiff then discussed the problem with Jim Takacs, the resident engineer on the project. Takacs's role was "to enforce the Davis-Bacon rates on the Camden [p]ublic [w]ork sites for the Camden Sewer Reconstruction Project[.]"[2] Takacs reviewed Elk's certified payroll records and determined certain laborers were not properly compensated, noting specifically there was no approved apprenticeship program, making use of that pay rate inappropriate.

Takacs told Tedesco that Elk must rectify its payroll discrepancies. He specifically identified plaintiff as one laborer whose pay rate was incorrect. In reference to plaintiff, Takacs recalled Tedesco stating something "off the

---

[2] The Davis-Bacon Act, originally 40 U.S.C.A. § 276A, and recodified as 40 U.S.C.A. § 3142, addresses federal wage rates for laborers and mechanics employees on federal public works projects. The statute requires contractors to pay the prevailing wage rate on public-bidding projects. New Jersey has adopted its own prevailing wage legislation, found at N.J.S.A. 34:11-56.27.

record" like "the owner wanted to f[---] with him and wants to get rid of him."

Thereafter, plaintiff and the other laborers' pay rates were restored to the prevailing wage rate. However, plaintiff maintained he did not receive all back pay he was due. During this time, Mecouch told him, "look, I was going to fire you, you're just not working out, but I'm going to give you a second chance." Plaintiff also spoke to Tedesco regarding his entitlement to additional back pay, but was told, "be quiet and keep your job or be laid off."

On December 16, 2010, plaintiff's employment on the project ended. Mecouch explained to plaintiff he was being laid off as the project neared completion and was being reassigned. Plaintiff never reported to his newly-assigned location.

On January 13, 2011, plaintiff filed his complaint alleging violations of the PWA, CEPA, along with individual liability claims against Mecouch under CEPA, and equitable relief. The parties settled the PWA claim.

After discovery, defendants moved for summary judgment dismissal of the remaining claims. Judge Jean B. McMaster concluded plaintiff's CEPA claim was actually a wage claim preempted by section 301(a) of the Labor Management Relations Act of 1947 (LMRA), 29 U.S.C.A. § 185(a), and the National Labor

Relations Act of 1935 (NLRA), 29 U.S.C.A. §§ 151-166. Plaintiff, arguing this was error, appeals from the grant of summary judgment and dismissal of his complaint.

## II.

Our review of summary judgment dismissal is de novo, Dep't of Envt'l Prot. v. Kafil, 395 N.J. Super. 597, 601 (App. Div. 2007), according no special deference to a judge's determination as a decision to grant or deny summary judgment does not hinge upon credibility of testimony or determinations of fact, but instead, amounts to a ruling on a question of law. See Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (noting that no "special deference" applies to a trial court's legal conclusions).

Employing the same standards used by the motion judge under Rule 4:46, Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012), our review examines whether, affording the non-moving party the benefit of all reasonable inferences, the movant has demonstrated there were no genuine disputes as to material facts. Atl. Mut. Ins. Co. v. Hillside Bottling Co., 387 N.J. Super. 224, 230 (App. Div.), certif. denied, 189 N.J. 104 (2006). If no genuine dispute exists, we then decide whether the motion judge's application of law was correct. Id. at 231. Our role is not to resolve contested factual issues, but to

determine whether a genuine factual dispute exists.  Aqurto v. Guhr, 381 N.J. Super. 519, 525 (App. Div. 2005).  See also Gormley v. Wood-El, 218 N.J. 72, 86 (2014) (quoting R. 4:46-2(c) ("A court should grant summary judgment only when the record reveals 'no genuine issue as to any material fact' and 'the moving party is entitled to a judgment or order as a matter of law.'")).  If the court finds materially disputed facts, the motion for summary judgment must be denied.  Brill, supra, 142 N.J. at 540; see, e.g., Parks v. Rogers, 176 N.J. 491, 502 (2003).  Summary judgment dismissal may be granted only when the evidence is found to be "'so one-sided that one party must prevail as a matter of law[.]'"  Brill, supra, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed. 2d 202, 214 (1986)).

On appeal, plaintiff argues the motion judge erroneously concluded federal law preempted his CEPA claim.  To successfully prove a claim under CEPA, plaintiff must demonstrate:

> (1) that he . . . reasonably believed that his . . . employer's conduct was violating either a law or a rule or regulation promulgated pursuant to law; (2) that he . . . performed whistle-blowing activity described in N.J.S.A. 34:19-3a, c(1) or c(2); (3) an adverse employment action was taken against him . . . ; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action.

> [Mosley v. Femina Fashions, Inc. 356 N.J.
> Super. 118, 127 (App. Div. 2002), certif.
> denied, 176 N.J. 279 (2003).]

Plaintiff asserts he suffered unlawful retaliation based on N.J.S.A. 34:19-3, which prohibits retaliatory conduct for disclosing unlawful activities. CEPA prohibits such conduct stating in pertinent part:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:
>
> a. Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer . . . that the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ; or
>
> (2) is fraudulent or criminal . . . ;
>
> b. . . .; or
>
> c. Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes:
>
> (1) is in violation of a law, or a rule or regulation promulgated pursuant to law . . . ;
>
> (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation . . . ; or
>
> (3) is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

8

[N.J.S.A. 34:19-3.]

The trial judge rejected plaintiff's complaint as framed, instead finding the substance of plaintiff's claims regarding matters preempted by federal law. The doctrine of preemption is based on the Supremacy Clause, which mandates "[t]he Federal Constitution and federal laws are 'the supreme Law of the Land' and 'Judges in every State [are] bound thereby; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.'" Chamber of Commerce v. State, 89 N.J. 131, 141 (1982) (quoting U.S. Const., Art. VI, cl. 2). Therefore, where Congress intends to regulate an area or subject matter, all state legislation frustrating that objective is displaced as constitutionally subordinate. See Malone v. White Motor Corp., 435 U.S. 497, 504, 98 S. Ct. 1185, 1190, 55 L. Ed. 2d 443, 450 (1978) (quoting Retail Clerks Int'l Assoc., Local 1625, AFL-CIO v. Schermerhorn, 375 U.S. 96, 103, 84 S. Ct. 219, 223, 11 L. Ed. 2d 179, 184 (1963) ("The purpose of Congress is the ultimate touchstone")).

"Preemption analysis begins with identifying the subject matter of the state law and determining whether . . . federal law [operates] in that field." Id. at 142 (citing Hines v. Davidowitz, 312 U.S. 52, 64-68, 61 S. Ct. 399, 402-404, 85 L. Ed. 581, 587 (1941)). A state law, which conflicts with federal

legislation governing the same area, must yield to and is preempted by the federal authority, thus, eliminating inconsistent state policies. Ibid. The question examined is whether Congress intended to preempt the subject matter which is addressed in the state legislation. Int'l Longshoremen's Ass'n v. Waterfront Comm'n, 85 N.J. 606, 612 (1981).

"In the labor-management field, Congress has not expressly provided for exclusive federal jurisdiction." Chamber of Commerce, supra, 89 N.J. at 142 (footnote omitted). Nevertheless, Congress has exercised extensive authority as the regulator of national labor policy and labor relations. Two such provisions — section 301(a) of the LMRA and section 7 of the NLRA — are cited by defendants as preempting plaintiff's alleged state law claims.

First, section 301(a) of the LMRA, states, in part:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.
>
> [29 U.S.C.A. § 185(a).]

"[Section] 301 requires the creation of uniform federal labor law to ensure uniform interpretation of collective bargaining

agreements[.]" Snyder v. Dietz & Watson, Inc., 837 F. Supp. 2d 428, 437 (D.N.J. 2011).

Made clear by the Supreme Court of the United States (SCOTUS) in Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 455-56, 77 S. Ct. 912, 1 L. Ed. 2d 972 (1957), "[section 301(a)] is not merely jurisdictional, but . . . also . . . calls on the federal courts to create a uniform federal common law of collective bargaining, with the primacy of arbitral resolution of industrial disputes as its centerpiece." Voilas v. GMC, 170 F.3d 367, 372 (3d Cir. 1999). "[S]tate laws that might produce differing interpretations of the parties' obligations under a collective bargaining agreement are preempted." Ibid. Accordingly, "[w]hen resolution of a [state law] claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a [section] 301 claim or dismissed as [preempted.]" Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 220, 105 S. Ct. 1904, 1915, 85 L. Ed. 2d 206, 221 (1985) (internal citation omitted). SCOTUS has stressed that the mere characterization of a claim as one "sounding in tort rather than contract [does] not bar the operation of [section] 301 preemption and reasoned that preemption of the employee's claim was necessary in order to avoid 'allowing parties to evade

11                                                          A-0886-13T1

the requirements of [section] 301 by relabeling their contract claims as claims for tortious breach of contract.'" Voilas, supra, 170 F.3d at 373 (quoting Allis-Chalmers, supra, 471 U.S. at 211, 105 S. Ct. at 1911, 85 L. Ed. 2d at 215).

Federal labor law also forbids state action focused on the enforcement of collective bargaining agreements, because section 7 of the NLRA, grants employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively . . . , and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C.A. § 157. Further, section 8 of the NLRA prohibits acts constituting an unfair labor practice.[3] George Harms Constr. Co. v. N.J. Tpk. Auth., 137 N.J. 8, 25-27 (1994).

Concisely, these provisions mandate that when examination focuses on whether the alleged state law claims require interpretation of the terms within the CBA, preemption applies. This requirement, that terms set forth in a CBA must be determined by federal law, avoids conflict as "[t]he possibility that individual contract terms might have different meanings under state and federal law would inevitably exert a disruptive influence upon both the negotiation and administration of

_____

[3] This is commonly known as the "Garmon pre-emption" as set forth in San Diego Building Trades Council v. Garmon, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959).

A-0886-13T1

collective agreements."  Teamsters v. Lucas Flour Co., 369 U.S. 95, 103, 82 S. Ct. 571, 577, 7 L. Ed. 2d 593, 599 (1962).  Were a different result allowed, "the process of negotiating an agreement would be made immeasurably more difficult by the necessity of trying to formulate contract provisions in such a way as to contain the same meaning under two or more systems of law which might someday be invoked in enforcing the contract." Ibid.  Preemption assures the purposes driving federal law

> will be frustrated neither by state laws purporting to determine "questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement," nor by parties' efforts to renege on their arbitration promises by "relabeling" as tort suits actions simply alleging breaches of duties assumed in collective bargaining agreements[.]
>
> [Livadas v. Bradshaw, 512 U.S. 107, 123, 114 S. Ct. 2068, 2078 (1994), 129 L. Ed. 2d 93, 109 (internal citations omitted).]

However, we do not read the provisions of the LMRA and NLRA so broadly as "to [preempt] nonnegotiable rights conferred on individual employees as a matter of state law[.]"  Id. at 123, 114 S. Ct. at 2079, 129 L. Ed. 2d at 109.

> [I]t is the legal character of a claim, as "independent" of rights under the collective bargaining agreement (and not whether a grievance arising from precisely the same set of facts could be pursued) that decides whether a state cause of action may go forward.

13

[Ibid. (internal citation and quotation marks omitted).]

"[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a [CBA] will be consulted in the course of [state law] litigation plainly does not require the claim to be extinguished[.]" Ibid. (citing Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 413 n. 12, 108 S. Ct. 1877, 1884, 100 L. Ed. 2d 410, 423 (1988) ("A collective bargaining agreement may, of course, contain information such as rate of pay . . . that might be helpful in determining the damages to which a worker prevailing in a state-law suit is entitled")).

Finally, if a plaintiff's claim implicates both federal and state law such that "evaluation of the tort claim is inextricably intertwined with consideration of the terms of the labor contract," the state claim is preempted. Allis-Chambers Corp., supra, 471 U.S. at 213, 105 S. Ct. at 1912, 85 L. Ed. 2d at 216. It is only when resolution of the state law claim does not require interpretation of the CBA that preemption is inapplicable. Labree v. Mobil Oil Corp., 300 N.J. Super. 234, 239 (App. Div. 1997) (citing Leonardis v. Burns Int'l Sec. Servs. Inc. 808 F. Supp. 1165, 1175 (D.N.J. 1992)).

In light of these principles we examine plaintiff's claimed causes of action. In his complaint, plaintiff avers he

seeks unpaid overtime compensation, the difference between actual wages paid and wages due pursuant to the PWA on public works jobs and seeks to remedy a retaliatory discharge which occurred after he made a good faith complaint of wage violations to his employer and after he disclosed wage violations to a state inspector.

The complaint further alleges plaintiff worked more hours than he was compensated for, "was entitled to a larger differential" than the sum actually remitted based on his proper rate of pay, and maintains his employment ended when he was "'laid off' . . . despite the fact he had more seniority with the company than other employees who were not laid off and who remained employed . . . ." Specifically as to this last issue, plaintiff argues his seniority status should have allowed him to continue to work, but instead, Elk ended his employment in retaliation for his whistle-blower activities.

Provisions within the CBA address the subject of employee wages, pay rates, overtime, and seniority. Specifically, Article V, entitled "Wage Rate," includes the hourly rates and classifications for all employees covered by the agreement and Articles VI and VII address the "regular hour[s] of work and the determination and rate of computation of overtime pay." In addition to discussing compensation for weekends and holidays, these sections discuss various scenarios requiring differentiated compensation. Most apt to the asserted

15

retaliation claim, however, is Article VIII, which governs seniority and lay-offs. This clause defines seniority for purposes of layoffs weighing not just objective factors, such as length of service, but also by considering subjective factors to determine who retains employment based upon seniority. Specifically, Article VIII provides:

> The Company agrees to base the seniority of employees on length of service. Length of Service is based on actual time spent with the Company. In all cases of promotion, demotion, lay-off, recalls and bumping, the following factors shall be considered,
>
> 1. Employee's classification.
>
> 2. Knowledge, ability, skill and efficiency, to perform the available work.
>
> 3. Qualifying tests, certification, and license.
>
> When all factors are relatively equal, the length of continuous service shall govern.

Contrary to plaintiff's suggestion, Elk's assessment of his seniority status, as compared to that of his colleagues who continued working, can only be reviewed by an analysis of the CBA's factors. Plaintiff's attempt to limit review exclusively to whether he engaged in protected whistle-blower activities for which he was laid off ignores that the project neared completion causing Elk to trim labor based upon seniority, a defined term of art under the CBA. Thus, this issue cannot be evaluated

16

absent review, consideration, and interpretation of the CBA and its terms.

Plaintiff, himself, confirmed this reality during his deposition. When asked why he contacted his union representative after his layoff, plaintiff explained "I had more seniority than everybody on the job except for the operator, so I should have been the last one to leave and that's a union matter." This statement exposes plaintiff's reliance on his rights as provided by the CBA and betrays his attempt to rebrand the contract contention into a CEPA claim. We determine plaintiff has injected a right created by his CBA, thereby pleading what can only "be regarded as a federal claim." Snyder, supra, 837 F. Supp. 2d at 445, n. 9.

We also find plaintiff's contention that his complaint does not allege a breach of the CBA terms or even implicate the agreement is belied by the facts. By maintaining he was wrongly laid off and should have continued working because he had seniority, plaintiff inherently invokes interpretation of the CBA. Thus, preemption applies. See Snyder, supra, 837 F. Supp. 2d at 438 (holding section 301 does not apply solely to contract violations but extends to tort action if their resolution depends upon "the meaning of a phrase or term in a collective bargaining agreement"). As SCOTUS noted in Livadas, federal

preemption under section 301 will not be thwarted by "parties' efforts to renege on their arbitration promises by 'relabeling' as tort suits actions simply alleging breaches of duties assumed in collective bargaining agreements." Livadas, supra, 512 U.S. at 123, 114 S. Ct. at 2078, 129 L. Ed. 2d at 109.

Following our review, we cannot accede to plaintiff's request to allow the CEPA claim to proceed. Judge McMaster fully analyzed the facts and law applicable to this issue, and properly determined plaintiff's complaint contained allegations inextricably intertwined with his rights delineated in the CBA. Therefore, the claims were properly held preempted by federal law.

Defendant additionally asserts plaintiff's claims are preempted by SCOTUS's holding in Garmon, supra, 359 U.S. at 244, 79 S. Ct. at 779, 3 L. Ed. 2d at 782, which considered sections 7 and 8 of the NLRA. Plaintiff disagrees, maintaining his claims are premised on whether he was retaliated against for complaining about wage deductions, and not for engaging in "concerted activity" under the NLRA.

As we noted, section 7 states:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective

A-0886-13T1

bargaining or other mutual aid or protection.

[29 U.S.C.A. § 157.]

Section 8 prohibits employers from interfering with, restraining, or coercing employees in the exercise of the rights guaranteed in section 7, or from acting to "discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subsection."  28 U.S.C. § 158.

In Garmon, SCOTUS instructed "when it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by section 7 of the National Labor Relations Act, or constitute an unfair labor practice under section 8, due regard for the federal enactment requires that state jurisdiction must yield."  Garmon, supra, 359 U.S. at 244, 79 S. Ct. at 779, 3 L. Ed. 2d at 782.  The burden rests with the party asserting preemption, who "'must [] put forth enough evidence to enable the court to find that the [National Labor Relations] Board reasonably could uphold a claim based on such an interpretation.'"  Voilas, supra 170 F.3d at 379 (quoting Int'l Longshoremen's Ass'n v. Davis, 476 U.S. 380, 395, 106 S. Ct. 1904, 1916, L. Ed. 2d 389, 405 (1986)).

> [T]here is no suggestion in the legislative history of the [NLRA] that Congress intended to disturb the myriad state laws then in

19                                                          A-0886-13T1

existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization. To the contrary, we believe that Congress developed the framework for self-organization and collective bargaining of the NLRA within the larger body of state law promoting public health and safety . . . . States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State.

[Metro. Life Ins. Co. v. Mass., 471 U.S. 724, 756, 105 S. Ct. 2380, 2397-98, 85 L. Ed. 2d 728, 750-51 (1985), overruled in part by Ky. Ass'n of Health Plans v. Miller, 538 U.S. 329, 341, 123 S. Ct. 1471, 1479, 155 L. Ed. 2d 468, 481 (2003) (internal quotation marks omitted).]

Nevertheless, Garmon precludes "state courts from entertaining tort actions for activities arguably subject to the protections of [section] 7 or the prohibitions of [section] 8 of the National Labor Relations Act." Blum v. Int. Assoc. of Machinists, AFL-CIO, 42 N.J. 389, 398 (1964).

Centering our review of the facts underpinning plaintiff's allegations, we do not agree the NLRA is inapplicable. An analysis of plaintiff's retaliatory discharge claim shows it is not limited to his report of Elk's wrongful payment practices. The claim does not stand alone and is not unrelated to the CBA. Rather, it is grounded on a violation of plaintiff's seniority status, as defined in the CBA, a negotiated provision governing

his employment, and thus, invoked provisions of the NLRA, requiring administrative review by the NLRB.[4]

Our review concludes plaintiff's claims are preempted by federal labor laws. Accordingly, plaintiff's complaint was properly dismissed.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[4] We conclude the record is insufficient to address defendant's assertion plaintiff engaged in a concerted activity as provided in the NLRA.

A-0886-13T1