NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3502-14T1

BRIAN HEJDA,

    Plaintiff-Appellant,

v.

BELL CONTAINER CORPORATION,

    Defendant-Respondent.

```
APPROVED FOR PUBLICATION

    May 9, 2017

 APPELLATE DIVISION
```

Argued September 14, 2016 — Decided May 9, 2017

Before Judges Messano, Espinosa and Guadagno.

On appeal from Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-4179-14.

John P. Brennan, Jr. argued the cause for appellant.

Jamie S. Felsen (Milman Labuda Law Group, PLLC) of the New York bar, admitted pro hac vice, argued the cause for respondent (Milman Labuda Law Group, PLLC, attorneys; Mr. Felsen, Netanel Newberger, and Robert F. Milman, of the New York bar, admitted pro hac, on the briefs).

Deborah L. Mains argued the cause for amicus curiae New Jersey Association for Justice (Costello & Mains, LLC, attorneys; Ms. Mains, on the brief).

The opinion of the court was delivered by

ESPINOSA J.A.D.

In <u>Puglia v. Elk Pipeline, Inc.</u>, 226 <u>N.J.</u> 258 (2016), our Supreme Court applied principles the United States Supreme Court clarified in <u>Hawaiian Airlines v. Norris</u>, 512 <u>U.S.</u> 246 114 <u>S. Ct.</u> 2239, 129 <u>L. Ed.</u> 2d 203 (1994), to conclude that an employee's state whistleblower claim was not pre-empted by § 301 of the Labor Management and Relations Act (LMRA), 29 <u>U.S.C.A.</u> 185(a).  This appeal presents the question whether an employee-union member's disability discrimination claim under the Law Against Discrimination (LAD), <u>N.J.S.A.</u> 10:5-1 to -49, and retaliatory discharge claim under the Workers' Compensation Law (WCL), <u>N.J.S.A.</u> 34:15-1 to -128.5, are pre-empted by § 301.  We conclude the claims as asserted are not pre-empted because they do not require interpretation of any provision of the collective bargaining agreement (CBA) between the union and employer.

I.

A.

Plaintiff Brian Hejda, a member of Teamsters Local Union 813, was employed as a commercial truck (CDL) driver by defendant Bell Container Corp. when he suffered a workplace injury to his knee on August 22, 2012.  A physician's assistant examined him at Bell's request and referred him for an MRI and six physical therapy

sessions.[1]  Hejda was cleared to return to work that day with the following restrictions: "No squatting and/or kneeling," "Must wear knee brace," and "No climbing stairs or ladders."  The report also noted, "NO WORK IF NO LIGHT DUTY."  Hejda averred that, despite these restrictions, Bell's safety director asked him to continue driving.  Hejda refused, orally demanded workers' compensation, and left for home.

After follow-up visits on September 21, 2012 and October 5, 2012, physician reports cleared Hejda to return to work immediately with the same restrictions, adding he was "[u]nable to drive company vehicle."  Hejda asserted Bell advised him that no light duty work was available.

In October and November 2012, Dr. Toby B. Husserl, an orthopedic specialist, examined Hejda's knee and reviewed his MRI results.[2]  He concluded Hejda required surgery and, without it,

---

[1] Hejda attended one physical therapy session.

[2] An MRI revealed Hejda had suffered:

> Complex tear posterior horn medial meniscus with displaced fragment into the intercondylar notch adjacent to the PCL. Nondisplaced truncation tear central-apical margin posterior horn lateral meniscus. Moderate suprapatellar joint effusion. Tricompartmental articular cartilage degeneration particularly at the patellar upper pole lateral facet and posterior weight bearing lateral tibial plateau.

A-3502-14T1

Hejda was not "safe for his work as a tractor-trailer driver and would be best sedentary." Although he cleared Hejda to return to work in November 2012, Dr. Husserl included the restriction that Hejda be limited to "Sedentary work (primarily sitting)," and perform "NO COMMERCIAL DRIVING."

On November 20, 2012, Hejda filed a workers' compensation claim with the New Jersey Department of Labor and Workforce Development, Division of Workers' Compensation (NJDOL). In its answer, Bell denied Hejda "sustained a disabling injury while in the course and scope of his/her employment with [Bell]."

In February 2013, Hejda consulted Dr. Mark Seckler, an orthopedic specialist. Dr. Seckler agreed with Dr. Husserl that arthroscopic surgery was "the treatment of choice" and that, despite Hejda's claim to be "absolutely asymptomatic," such surgery was inevitable. Nevertheless, he cleared Hejda to return to work on February 7, 2013, with full duty and no restrictions.

Hejda reported to work every day during the week of February 11-15, 2013, but was not given much to do. When he reported to work the following week, he was told by Bell to leave.

B.

On February 20, 2013, Bell sent a letter to the union explaining that before Hejda could return to work, he had to be recertified pursuant to the Department of Transportation (DOT)

Federal Motor Carrier Safety Regulation, 49 C.F.R. § 391.45(c). That regulation requires "[a]ny driver whose ability to perform his/her normal duties has been impaired by a physical or mental injury or disease" to be "medically examined and certified in accordance with [49 C.F.R.]§ 391.43 as physically qualified to operate a commercial motor vehicle."

49 C.F.R. § 391.43(a) requires that the physical examination "be performed by a medical examiner listed on the National Registry of Certified Medical Examiners." In addition, medical examiners must:

> (1) Be knowledgeable of the specific physical and mental demands associated with operating a commercial motor vehicle and the requirements of this subpart, including the medical advisory criteria prepared by the [Federal Motor Carrier Safety Administration] as guidelines to aid the medical examiner in making the qualification determination; and
>
> (2) Be proficient in the use of and use the medical protocols necessary to adequately perform the medical examination required by this section.
>
> [49 C.F.R. § 391.43(c).]

The results of the medical examination must be recorded on a specified Medical Examination Report Form, MCSA-5875, set forth in the regulation. 49 C.F.R. § 391.43(f). That form requires the driver to complete a "Health History," which must be reviewed and discussed with the physician.

In its letter to the union, Bell represented it would contact Hejda to schedule the recertification. Hejda declined to submit to the scheduled independent medical examination.

C.

Pursuant to the terms of the CBA, the union filed a grievance against Bell in February 2013, alleging violations of Articles 2 (wages), 4 (hours), 5 (overtime), 19 (non-discrimination) and 20 (seniority) of the CBA for "failure to schedule [Hejda] to work after doctor's release." The remedy requested was payment of "all lost wages and benefits as well as schedule to work immediately." The grievance arbitration was conducted on April 5, 2013.

On April 11, 2013, Hejda obtained a medical certificate from Dr. Alexander Goldberg, a family physician.[3] On the form, Hejda certified he had provided "complete and true" information and acknowledged the examination and certification could be invalidated by "inaccurate, false or missing information." However, he reported he had no medical history of issues relating to an "impaired . . . leg." Dr. Goldberg's comments on the form reflect no discussion of Hejda's knee injury. Dr. Goldberg

---

[3] After Hejda obtained this certificate, the NJDOL found him eligible for workers compensation benefits without restriction, from April 7, 2013. Bell appealed, arguing Hejda was discharged for reasons that constituted misconduct in connection with his work. The Appeal Tribunal rejected this argument and affirmed the award.

executed the Medical Examiner's Certificate and sent a copy to Bell.

Bell asked Dr. Goldberg to confirm he considered the evaluations made by Dr. Husserl and Dr. Seckler. Dr. Goldberg wrote a letter to Hejda, acknowledging he knew about Hejda's work injury and subsequent clearance to return to work, and reiterated that Hejda "meets the standards in 49 [C.F.R. §] 391.41; [and is] qualified for 2 year certificate." Bell accused Hejda of obtaining the certificate from Dr. Goldberg "under false pretenses" by failing to inform him of his knee injury or provide him with the earlier evaluations.

In July 2013, the arbitrator issued an award and opinion, denying the union's grievance. The issue arbitrated was "[w]hether the Employer's refusal to return the Grievant to his former position upon Dr. Seckler's letter violated the [CBA] or applicable [DOT] regulations, and, if so, what shall the remedy [be]?" The arbitrator identified the applicable contract section as Article 32, which addresses the employer's rights.[4]

---

[4] Article 32 of the CBA states, in part:

> (a) [T]he Employer shall retain all the rights and functions of management that it has by law, and the exercise of any such rights or functions shall not be subject to arbitration . . . .
> (b) The Union recognizes the right of the Employer to establish work rules, regulations,

Bell submitted it had "just cause"[5] for refusing to reinstate Hejda as a CDL driver until he was certified in compliance with 49 C.F.R. § 391.43.[6] The union argued that Hejda should be reinstated because Dr. Goldberg had provided a medical examiner's certificate.

The arbitrator explicitly stated the arbitration opinion was "not a just cause determination" but also found the union failed to prove Bell had violated the CBA. The arbitrator observed that the regulation, 49 C.F.R. § 391.45(c), was "a law that [Bell] was required to follow and by contract, is entitled to manage its

---

> and policies covering the operations of its trucking fleet and the conduct of its employees. Such rights shall include but not be limited to issuing rules concerning safety, training, and efficient operations. . . .
> (c) It is agreed and understood that if the Employee aggrieved as a result of a rule or direction, he will observe the rule or direction and express the grievance through the grievance procedure provided in this Agreement and not through the failure to comply therewith.

[5] Article 18 of the CBA, which addresses employee discharge, acknowledges Bell's "right to discharge or take any appropriate disciplinary action against Employees for . . . just cause."

[6] Hejda was also examined, in May 2013, by another orthopedic specialist, Dr. Robert I. Dennis, at Bell's request. Dr. Dennis concluded Hejda "does have a functional range of motion to be able to carry out the duties of a tractor-trailer driver even one that has to unload with pallets without hesitation." Dr. Dennis's evaluation is not mentioned in the arbitrator's award and opinion.

employees, like [Hejda] under that law."[7] In light of the specific requirements for recertification set forth in the DOT regulations, which were not satisfied by the evaluations submitted by Hejda, the arbitrator concluded the issue of Hejda's reinstatement would be held in abeyance until such time that he was examined and certified pursuant to 49 C.F.R. § 391.41(b)(2). Until that time, Hejda was to remain on a medical layoff consistent with other terms of the CBA.

### D.

In March 2013, Hejda filed a Complaint of Discrimination against Bell with the NJDOL's Office of Special Compensation Funds, alleging he had been discriminated against because he filed a workers compensation claim. In its answer, Bell asserted Hejda's employment had not been reinstated because he had not yet been recertified pursuant to 49 C.F.R. § 391.45 and not for any discriminatory reason. In September 2014, the Office of Administrative Law dismissed this complaint without prejudice, concluding Hejda could not have been discriminated or retaliated against because he was not eligible to return to work without

---

[7] Article 35 of the CBA addresses examinations, and states: "Physical or other examinations (including [DOT] physicals) required by any government body shall be promptly complied with by all Employees provided, however, the Employer shall pay for all such examinations."

proper certification and Bell had no obligation to reinstate a worker who was not properly certified.

E.

In November 2013, Hejda submitted a second certification from Dr. Goldberg that purported to comply with the regulatory requirements, along with a demand to be returned to work as a truck driver. Bell offered him the position of "night switcher." Hejda continued to demand reinstatement as a CDL driver, claiming the night switcher offer was "obviously intended to retaliate against [Hejda] for his assertion of his legal rights and in discrimination of [Bell's] apparent unwarranted belief he has a handicap/disability which prevents him from performing his position as a" CDL driver.

F.

In October 2014, Hejda filed this lawsuit, alleging Bell's refusal to reinstate him to his position as a truck driver constituted unlawful discrimination under the LAD and retaliation under the WCL. Bell moved to dismiss the complaint pursuant to Rule 4:6-2(a), on the ground that both the LAD and WCL claims are pre-empted by § 301 of the LMRA because their adjudication "require[s] an interpretation and application of various provisions of [the CBA]." Bell also argued Hejda's claims are pre-empted by DOT regulations and barred by collateral estoppel.

10

Finally, Bell contended that, because Hejda did not receive recertification pursuant to the applicable DOT regulations, he was not qualified to be a CDL driver and, therefore, could not establish an LAD disability discrimination claim.

Because the trial judge concluded "the provisions of the CBA must be analyzed to determine . . . the claims and defenses at issue," she found the claims pre-empted and dismissed the complaint for lack of subject matter jurisdiction pursuant to Rule 4:6-2(a). Accordingly, she did not address Bell's other arguments for dismissal.

In this appeal, Hejda argues the trial judge erred in concluding his claims were pre-empted by federal law. He also argues the judge erred in failing to afford him all reasonable inferences from the facts in accord with the standard applicable to summary judgment motions, Rule 4:46-2(c), and deciding the case before discovery was complete. We need not address these arguments because the question of pre-emption is a purely legal issue, which we review de novo. See Santiago v. N.Y. & N.J. Port Auth., 429 N.J. Super. 150, 156 (App. Div. 2012), certif. denied, 214 N.J. 175 (2013). Bell counters that the trial judge correctly ruled that Hejda's claims were pre-empted. Amicus curiae New Jersey Association for Justice argues in support of Hejda's position.

11                                          A-3502-14T1

II.

"Whether federal law pre-empts a state law establishing a cause of action is a question of congressional intent." Hawaiian Airlines, supra, 512 U.S. at 252, 114 S. Ct. at 2243, 129 L. Ed. 2d at 211 (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 208, 105 S. Ct. 1904, 1909-10, 85 L. Ed. 2d 206, 213 (1985)). A federal statute will be read to supersede a State's historic powers only if this is "'the clear and manifest purpose of Congress.'" Hillsborough Cty. v. Automated Med. Labs., Inc., 471 U.S. 707, 715, 105 S. Ct. 2371, 2376, 85 L. Ed. 2d 714, 722-23 (1985) (quoting Jones v. Rath Packing Co., 430 U.S. 519, 525, 97 S. Ct. 1305, 1309, 51 L. Ed. 2d 604, 614 (1977)). Pre-emption is not to be "lightly inferred" in areas, such as the establishment of employment standards, which lie "within the traditional police power of the State." Hawaiian Airlines, supra, 512 U.S. at 252, 114 S. Ct. at 2243, 129 L. Ed. 2d at 211 (quoting Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 21, 107 S. Ct. 2211, 2222, 96 L. Ed. 2d 1, 17 (1987)).

Section 301 of the LMRA grants subject matter jurisdiction to the federal courts over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this Act." 29 U.S.C.A. § 185(a) (emphasis added). Federal courts are

12

charged with "fashion[ing] a body of federal law for the enforcement of these collective bargaining agreements." Textile Workers v. Lincoln Mills of Ala., 353 U.S. 448, 451, 77 S. Ct. 912, 915, 1 L. Ed. 2d 972, 977 (1957). Pre-emption in this context implements the congressional intent "to promote the peaceable, consistent resolution of labor-management disputes" by insuring the uniform interpretation of terms in collective bargaining agreements. Lingle v. Norge Div. of Magic Chef, 486 U.S. 399, 404, 108 S. Ct. 1877, 1880, 100 L. Ed. 2d 410, 417 (1988).

The practical consequence of this principle is that when a suit in state court alleges a violation of a labor contract, it "must be brought under § 301 and be resolved by reference to federal law."[8] Lueck, supra, 471 U.S. at 210, 105 S. Ct. at 1911, 85 L. Ed. 2d at 215. In such circumstances, pre-emption serves congressional intent by precluding the creation of a "state rule that purports to define the meaning or scope of a term in a contract suit" and conflicts with a federal interpretation. Ibid.

---

[8] State courts have concurrent jurisdiction over § 301 claims but are bound to apply federal law in deciding these claims. See Local 174, Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Lucas Flour, 369 U.S. 95, 102-03, 82 S. Ct. 571, 576, 7 L. Ed. 2d 593, 598 (1962); Charles Dowd Box Co. v. Courtney, 368 U.S. 502, 508, 82 S. Ct. 519, 523 7 L. Ed. 2d 483, 488 (1962).

A-3502-14T1

A state-law claim that does not present a straightforward question of contract interpretation requires further examination. "[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim or dismissed as pre-empted by federal labor-contract law." Id. at 220, 105 S. Ct. at 1916, 85 L. Ed. 2d at 221 (citation omitted); accord Lingle, supra, 486 U.S. at 405-06, 108 S. Ct. at 1881, 100 L. Ed. 2d at 418-19.  By way of example, there is such substantial dependence when the state-law claim requires "interpretation of a collective bargaining agreement to determine the content and scope of the agreement, and what legal consequences were intended to flow from a breach of an agreement."  Nieves v. Individualized Shirts, 961 F. Supp. 782, 792 (D.N.J. 1997) (citing Lucas Flour, supra, 369 U.S. at 103-04, 82 S. Ct. at 577, 7 L. Ed. 2d at 599).

In short, because of the compelling need for federal labor-law principles to be uniformly applied,

> if the resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement, the application of state law . . . is pre-empted and federal labor-law principles . . . must be employed to resolve the dispute.
>
> [Lingle, supra, 486 U.S. at 405-06, 108 S. Ct. at 1881; 100 L. Ed. 2d at 418-19 (emphasis

A-3502-14T1

added); accord Puglia, supra, 226 N.J. at 276.[9]]

This does not mean "every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301 or other provisions of the federal labor law." Lueck, supra, 471 U.S. at 211, 105 S. Ct. at 1911, 85 L. Ed. 2d at 215. "[T]here is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements." Lingle, supra, 486 U.S. at 411, 108 S. Ct. at 1884, 100 L. Ed. 2d at 422. The Supreme Court explained, "it would be inconsistent with congressional intent under [§ 301]" to extend its pre-emptive effect "beyond suits for breach of contract . . . to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." Lueck, supra, 471 U.S. at 212, 105 S. Ct. at 1912, 85 L. Ed. 2d at 216. The holding in Lingle concisely states the governing principle: "[A]n application of state law is preempted by § 301 of the [LMRA] only if such application requires the interpretation of a collective-bargaining agreement." 486 U.S. at 413, 108 S. Ct. at 1884, 100 L. Ed. 2d at 423 (emphasis added).

---

[9] The trial court did not have the benefit of the Supreme Court's decision in Puglia at the time it rendered its decision and relied upon our decision, Puglia v. Elk Pipeline, Inc., 437 N.J. Super. 466 (App. Div. 2014), which was reversed by the Supreme Court.

Inevitably, there are times when a grievance may be pursued either through a claim that a provision of the CBA has been violated or a claim that has its roots in state law. Under such circumstances, the fact the employee has the ability to assert parallel claims under the CBA and under state law does not convert the state-law-based claim into one "dependent on the CBA." Puglia, supra, 226 N.J. at 281. The state-law claim is not necessarily pre-empted even when reference to the CBA assists in the calculation of damages to which a prevailing state-law plaintiff is entitled:

> Although federal law would govern the interpretation of the agreement to determine the proper damages, the underlying state-law claim, not otherwise pre-empted, would stand. Thus, as a general proposition, a state-law claim may depend for its resolution upon both the interpretation of a collective-bargaining agreement and a separate state-law analysis that does not turn on the agreement. In such a case, federal law would govern the interpretation of the agreement, but the separate state-law analysis would not be thereby pre-empted.
>
> [Lingle, supra, 486 U.S. at 413 n.12, 108 S. Ct. at 1884, 100 L. Ed. 2d at 423 (emphasis added).]

As our Supreme Court observed, the plaintiff in Puglia could have asserted parallel claims based on the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14, or on provisions of the CBA. Puglia, supra, 226 N.J. at 281. In rejecting the

argument that his CEPA claim was pre-empted under § 301, the Court observed,

> Mere factual parallelism between a CEPA claim and a CBA-based claim does not make a CEPA claim dependent on the CBA. Puglia is not asking New Jersey courts to use New Jersey law to define the ins and outs of his bargained-for employment relationship with Elk. He is asking our courts to enforce his rights under CEPA, independent and apart from his bargained-for employment conditions. That, our courts can do.
>
> [Ibid.]

Thus, our evaluation of the § 301 pre-emption question begins with Hejda's complaint, which we review "to find the source of the right that he alleges [Bell] infringed. From that, we can determine whether [Hejda's] claim requires an interpretation of the CBA." See id. at 280.

The assertion of a defense based on the CBA will not necessarily alter the resolution of the pre-emption question. Ordinarily, a CBA-based defense is "insufficient to preempt an independent state-law action," because in the typical case, it is unnecessary to interpret the just cause language of a CBA in order to resolve a discrimination or retaliatory discharge claim. Id. at 279-80 (citing Hawaiian Airlines, supra, 512 U.S. at 266, 114 S. Ct. at 2251, 129 L. Ed. 2d at 220); see also Lingle, supra, 486 U.S. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 419-20. To determine whether pre-emption is required as a result of the

17

defense, we still "look to what a plaintiff must prove" in the state-law claim. Puglia, supra, 226 N.J. at 282.

A.

We first address Hejda's claim that Bell retaliated against him for filing a workers compensation claim. Our analysis is guided by the Supreme Court's decision in Lingle, in which the plaintiff also claimed she was discharged for filing a workers compensation claim. 486 U.S. at 401, 108 S. Ct. at 1879, 100 L. Ed. 2d at 416. The Supreme Court rejected the Circuit Court's conclusion that the claim was pre-empted by § 301, stating,

> [E]ven if dispute resolution pursuant to a collective-bargaining agreement, on the one hand, and state law, on the other, would require addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is "independent" of the agreement for § 301 pre-emption purposes.
>
> [Id. at 409-10, 108 S. Ct. at 1883, 100 L. Ed. 2d at 421.]

The Court reviewed the elements of the workers compensation retaliation tort recognized by Illinois courts, i.e., "that (1) [the employee] was discharged or threatened with discharge and (2) the employer's motive in discharging or threatening to discharge him was to deter him from exercising his rights under the [Illinois workers compensation statute] or to interfere with his exercise of those rights." Id. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d

18

at 419 (citation omitted). The Court stated each of these elements presented "purely factual questions" that "pertain[] to the conduct of the employee and the conduct and motivation of the employer" and did not "require[] a court to interpret any term of a collective-bargaining agreement." Ibid. The Court also noted the defense against such a claim — proof of a nonretaliatory reason for the discharge — also entailed a "purely factual inquiry [that] does not turn on the meaning of any provision of a collective-bargaining agreement." Id. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 420. The Court therefore concluded, "the state-law remedy in this case is 'independent' of the collective-bargaining agreement in the sense of 'independent' that matters for § 301 pre-emption purposes: resolution of the state-law claim does not require construing the collective-bargaining agreement." Ibid.

The essential elements of a claim under N.J.S.A. 34:15-39.1[10] require similar proof: "(1) that [Hejda] made or attempted to make a claim for workers' compensation; and (2) that he was discharged in retaliation for making that claim." Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442-43 (App. Div. 1988) (quoting Galante v. Sandoz, Inc., 192 N.J. Super. 403, 407 (Law Div. 1983), aff'd,

---

[10] N.J.S.A. 34:15-39.1 makes it unlawful "to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation benefits from such employer."

196 N.J. Super. 568 (App. Div. 1984)).  In the count asserting this claim, Hejda made no reference to any provision of the CBA. He alleged the essential elements of the cause of action: that Bell unlawfully discriminated against him and discharged him from his employment because he filed a workers compensation claim and that the nature and extent of his injury did not preclude him from performing his job.

As the Court concluded in Lingle, each of these allegations presents a "purely factual inquiry" that does not require the interpretation of any provision of the CBA.  Lingle, supra, 486 U.S. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 420; accord Puglia, supra, 226 N.J. at 280. Hejda's workers compensation retaliation claim is, therefore, "independent" of the CBA and not pre-empted by § 301.  Puglia, supra, 226 N.J. at 282; accord Conaway v. Webster City Products Co., 431 N.W. 2d 795, 799 (Iowa 1988).

### B.

Hejda asserted his LAD disability discrimination claim in a count that alleged:

- Hejda has a disability and is regarded by Bell as having a covered disability.

- Bell knew he had a disability and discriminated against him while he was impaired and because of his impairment.

- Hejda made repeated demands for reasonable accommodations.

- Hejda was "otherwise qualified for employment with [Bell] with or without reasonable accommodation."

- Bell discriminated against Hejda "in employment opportunity" despite the fact that "he was qualified for employment and previously performed his duties in accordance with the terms of his employment."

- Bell failed to engage him "in a good faith interactive process regarding his requests for reasonable accommodation and wrongfully failed to provide [him] with reasonable accommodation."

- Bell retaliated against him "because of his disability," wrongfully altering "the terms and conditions of [his] employment based upon discriminatory and retaliatory intent."

None of these allegations call for the interpretation of any provision of the CBA.[11] Whether or not a parallel avenue existed in the CBA for Hejda to pursue his allegations, the complaint alleges a cause of action under the LAD, which plainly establishes rights that are independent of the CBA.

To present a prima facie case of disability discrimination under LAD, Hejda was required to prove: (1) he was disabled (or

---

[11] Article 19 of the CBA, titled "Non-discrimination," prohibits discrimination based on "race, color, religion, sex, national origin, pregnancy, or age" and does not address discrimination based on disability.

perceived to be disabled); (2) he was objectively qualified for his former position; (3) he was terminated; and (4) the employer sought someone to perform the same work after the plaintiff's discharge. <u>Zive v. Stanley Roberts, Inc.</u>, 182 <u>N.J.</u> 436, 450 (2005). If the employee establishes a prima facie case, "the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employer's action." <u>Id.</u> at 449. Once that reason is articulated, it is left to the employee to prove by a preponderance of the evidence that the reason was merely pretextual. <u>Ibid.</u>

Each of these elements presents a "purely factual inquiry." As the Court noted in <u>Puglia</u>:

> Whether Puglia performed a whistleblowing activity in reporting the alleged failure by Elk to abide by Prevailing Wage Act requirements, and whether Elk retaliated against Puglia for doing so are factual questions, untied to any interpretation of the CBA. CEPA creates independent rights. Puglia's CEPA cause of action is unaffected by whether the CBA was violated; it asks only whether Puglia's whistleblowing activity played a role in his termination.

> [226 <u>N.J.</u> at 280.]

This analysis marks a departure from the Court's decision in <u>Maher v. N.J. Transit Rail Operations</u>, 125 <u>N.J.</u> 455 (1991). The plaintiff in <u>Maher</u> was discharged after he refused to comply with the requirement of his employer, New Jersey Transit (NJT), to wear

22                                                                    <span>A-3502-14T1</span>

safety glasses at all times. Id. at 461. He filed suit, alleging violations of LAD and CEPA. Id. at 463. The Court found the plaintiff's LAD claim pre-empted by the Railway Labor Act (RLA), 45 U.S.C.A. §§ 151 to 188. Id. at 479. Distinguishing Lingle, the Court stated the defense did not "hinge on consideration of 'purely factual questions,'" and that "[a]n evaluation of whether NJT's actions were reasonable would have to be based on consideration of the carrier's conduct in following provisions of the collective-bargaining agreement." Id. at 481.

The term, "purely factual inquiry," is not a model of clarity on its face. But, the United States Supreme Court's decision in Hawaiian Airlines provides guidance for its application.

In Hawaiian Airlines, supra, 512 U.S. at 266, 114 S. Ct. at 2251, 129 L. Ed. 2d at 220, the Supreme Court affirmed the decision by the Supreme Court of Hawaii that an employee's claims for discharge in violation of public policy and a state whistleblower act were not pre-empted by the RLA. The Court adopted the framework articulated in Lingle and emphasized "the existence of a potential CBA-based remedy did not deprive an employee of independent remedies available under state law." Id. at 261, 114 S. Ct. at 2248, 129 L. Ed. 2d at 216. Turning to the impact of a CBA-based defense, the Court rejected the employer's contention "that the state tort claims require a determination whether the

discharge . . . was justified by respondent's failure to sign the maintenance record, as the CBA required him to do." Id. at 266, 114 S. Ct. at 2251, 129 L. Ed. 2d at 220. A distinction was drawn between an allegation that a discharge violated the CBA, which would require such a determination, and the state tort claims that, "by contrast, require only the purely factual inquiry into any retaliatory motive of the employer." Ibid.

In Puglia, the Court cited Hawaiian Airlines as "fortif[ying] the view that . . . a CBA-based defense is ordinarily insufficient to preempt a state-law action," by "explain[ing] that . . . the issue to be decided in this action —— whether the employer's actions make out the element of discharge under [state] law —— is a 'purely factual question.'" 226 N.J. at 279 (quoting Hawaiian Airlines, supra, 512 U.S. at 266, 114 S. Ct. at 2251, 129 L. Ed. 2d at 220).

Our Supreme Court further noted the Court's rejection of the employer's argument that the state-law claim required a determination whether its action was justified by the employee's failure to comply with a requirement of the CBA. Ibid. Observing that Maher was decided before Hawaiian Airlines, the Puglia Court spurned the suggestion that Maher provided authority for the proposition that a CBA-based defense would pre-empt a state-law claim. Id. at 280, n.4. Our distillation of these opinions leads

24                                                          A-3502-14T1

us to conclude that the defining characteristic of a "purely factual inquiry" is that it "does not turn on the meaning of any provision of a collective-bargaining agreement." Lingle, supra, 486 U.S. at 407, 108 S. Ct. at 1882, 100 L. Ed. 2d at 420.

We recognize that the question whether Hejda was "objectively qualified" to be reinstated as a truck driver implicates the recertification requirements of 49 C.F.R. § 391.45. It is also true that the CBA contains provisions relevant to this regulatory requirement, most notably, Article 35, which states: "Physical or other examinations (including [DOT] physicals) required by any government body shall be promptly complied with by all Employees . . . ." But, contrary to the arguments advanced by Bell, neither Hejda's claim nor Bell's defense requires the interpretation of any provision of the CBA. The requirement that Hejda be recertified was not imposed by Bell in the exercise of its rights under the CBA. It is a function of the DOT regulation which, as the arbitrator noted, is law that Bell is required to follow. The applicable regulations, 49 C.F.R. §§ 391.41, 391.43 and 391.45,[12] are straightforward in their requirements. To the extent an interpretation of them is required, federal law must be applied.

_____

[12] 49 C.F.R. § 391.47 provides a procedure for the resolution of conflicts of medical evaluations obtained by the driver and the employer. The record does not disclose if the parties engaged in this procedure or satisfied the criteria for its application.

As we have noted, the trial judge dismissed the complaint pursuant to Rule 4:6-2(a) for lack of subject matter jurisdiction, and did not address the other grounds advanced by Bell in its motion. Accordingly, our review has been limited to that issue. We offer no opinion as to the merits of plaintiff's claims or any of the other arguments presented by Bell. The order dismissing the complaint for lack of subject matter jurisdiction is reversed and the matter remanded. We do not retain jurisdiction.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION